## ROSENBERG ET AL. *v.* UNITED STATES.

No. ——, June 18 Special Term, 1953.
Argued June 18, 1953.—Decided June 19, 1953.

273

274

*Acting Solicitor General Stern* argued the cause for the United States. With him on the motion and the brief in support thereof was *Attorney General Brownell.*

Arguments in opposition to the Government's motion were made by *Daniel G. Marshall, pro hac vice,* by special leave of the Court, and by *Emanuel H. Bloch, John F. Finerty* and *Fyke Farmer.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.*

A Special Term of the Court was convened upon the Attorney General's application to review a stay of execution in this case, issued by MR. JUSTICE DOUGLAS.

Our action was unusual. So were the circumstances which led to it. The Court's action should be considered in the context of the full history of the proceedings which have marked this case.

On August 17, 1950, the defendants were indicted for conspiring to commit espionage in wartime, in violation of the Espionage Act of 1917, 50 U. S. C. §§ 32 (a), 34. After a lengthy jury trial they were found guilty, and on April 5, 1951, they were sentenced to death. Upon appeal the Court of Appeals affirmed.[1] A petition for rehearing was denied.

A petition for certiorari was filed here. It was denied on October 13, 1952.[2] A petition for rehearing was filed October 28, 1952. It was denied on November 17, 1952.[3]

One week thereafter, a motion was filed in the District Court under § 2255 of the Judicial Code (28 U. S. C.

---

*[NOTE: This opinion was filed July 16, 1953.]

[1] 195 F. 2d 583.

[2] 344 U. S. 838. The order noted that MR. JUSTICE BLACK was of the opinion that certiorari should be granted.

[3] 344 U. S. 889–890. The full text of the order reads:

"Motion for leave to file brief of Dr. W. E. B. Dubois and others, as *amici curiae,* denied. Petitions for rehearing denied. Memorandum filed by MR. JUSTICE FRANKFURTER in No. 111. MR. JUSTICE BLACK adheres to his view that the petitions for certiorari should be granted.

"MR. JUSTICE FRANKFURTER.

"Petitioners are under death sentence, and it is not unreasonable to feel that before life is taken review should be open in the highest court of the society which has condemned them. Such right of review was the law of the land for twenty years. By § 6 of the Act of February 6, 1889, 25 Stat. 655, 656, convictions in capital cases arising under federal statutes were appealable here. But in 1911 Congress abolished the appeal as of right, and since then death

§ 2255) to vacate the judgment and sentence. That motion (hereafter called the first § 2255 motion) did not challenge the power of the District Court to impose the death sentence. It was denied.[4] The Court of Appeals

---

sentences have come here only under the same conditions that apply to any criminal conviction in a federal court. (§§ 128, 238, 240 and 241 of the Judicial Code, 36 Stat. 1087, 1133, 1157.)

"The Courts of Appeals are charged by Congress with the duty of reviewing all criminal convictions. These are courts of great authority and corresponding responsibility. The Court of Appeals for the Second Circuit was deeply conscious of its responsibility in this case. Speaking through Judge Frank, it said: 'Since two of the defendants must be put to death if the judgments stand, it goes without saying that we have scrutinized the record with extraordinary care to see whether it contains any of the errors asserted on this appeal.' 195 F. 2d 583, 590.

"After further consideration, the Court has adhered to its denial of this petition for certiorari. Misconception regarding the meaning of such a denial persists despite repeated attempts at explanation. It means, and all that it means is, that there were not four members of the Court to whom the grounds on which the decision of the Court of Appeals was challenged seemed sufficiently important when judged by the standards governing the issue of the discretionary writ of certiorari. It also deserves to be repeated that the effective administration of justice precludes this Court from giving reasons, however briefly, for its denial of a petition for certiorari. I have heretofore explained the reasons that for me also militate against noting individual votes when a petition for certiorari is denied. See *Chemical Bank & Trust Co.* v. *Group of Institutional Investors*, 343 U. S. 982.

"Numerous grounds were urged in support of this petition for certiorari; the petition for rehearing raised five additional questions. So far as these questions come within the power of this Court to adjudicate, I do not, of course, imply any opinion upon them. One of the questions, however, first raised in the petition for rehearing, is beyond the scope of the authority of this Court, and I deem it appropriate to say so. A sentence imposed by a United States district court, even though it be a death sentence, is not within the power of this Court to revise."

[4] 108 F. Supp. 798.

affirmed.[5]   Certiorari was again sought here, and denied on May 25, 1953.   The stay entered by the Court of Appeals was vacated by this Court on the same date.[6]   On the next day, a petition for a stay, pending the consideration of a petition for rehearing, to be filed by June 9, 1953, was denied by THE CHIEF JUSTICE. A petition for rehearing was filed and was pending during the last week of the 1952 Term of the Court, the adjournment of the Term having been announced for June 15, 1953.

In the meantime, execution of the sentence was set for the week of June 15th by the District Judge, and two further motions under § 2255 to vacate judgment and sentence were denied in District Court, one on June 1, 1953 and another on June 8, 1953.   Those denials were affirmed by the Court of Appeals on June 5 and June 11, 1953, respectively.

In addition to those two motions under § 2255, a petition was also presented to the Court of Appeals asking that a writ of mandamus be issued, directing the sentencing judge to resentence the defendants.   On June 2, 1953, the Court of Appeals denied relief by way of mandamus.   Thus, as of June 12, 1953, three decisions had been entered by the Court of Appeals in collateral attacks upon the sentence, all three attacks having been instituted

---

[5] 200 F. 2d 666.

[6] 345 U. S. 965.   The full text of the order, Journal, May 25, 1953, p. 225, reads:

"Motions for leave to file briefs of National Lawyers Guild and Joseph Brainin et al., as *amici curiae* denied.   Petition for writ of certiorari to the United States Court of Appeals for the Second Circuit denied.   The order of the United States Court of Appeals of February 17, 1953, granting a stay of execution is vacated.   Mr. Justice Black and Mr. Justice Frankfurter referring to the positions they took when these cases were here last November, adhere to them.   344 U. S. 889.   Mr. Justice Douglas is of the opinion the petition for certiorari should be granted."

by the defendants after our denial of certiorari on May 25, 1953, as to the first motion under § 2255.

On June 12, 1953, an application for a stay of execution was filed with the Clerk of this Court and presented to MR. JUSTICE JACKSON, the appropriate Circuit Justice. This stay was requested to enable the Rosenbergs to seek review of the three most recent decisions of the Court of Appeals "within the time ordered by the applicable statute." MR. JUSTICE JACKSON referred this application to the full Court, with a recommendation that oral argument be heard on it. On June 15, 1953, the last session of the 1952 Term, the Court declined to hear oral argument on this application and denied the stay.[7] The

---

[7] 345 U. S. 989. The full text of the order reads:

"An application for stay of execution was filed herein on June 12, 1953. It was referred to MR. JUSTICE JACKSON, the appropriate Circuit Justice. MR. JUSTICE JACKSON referred it to the Court for consideration and action, with the recommendation 'that it be set for oral hearing on Monday, June 15, 1953, at which time the parties have agreed to be ready for argument.'

"Upon consideration of the recommendation, the Court declined to hear oral argument on the application.

"MR. JUSTICE FRANKFURTER and MR. JUSTICE BURTON, agreeing with MR. JUSTICE JACKSON's recommendation, believe that the application should be set for hearing on Monday, June 15, 1953.

"Thereupon, the Court gave consideration to the application for the stay, and denies it, MR. JUSTICE BURTON joining in such denial.

"Mr. JUSTICE FRANKFURTER and MR. JUSTICE JACKSON, believing that the application for a stay should not be acted upon without a hearing before the full Court, do not agree that the stay should be denied.

"MR. JUSTICE BLACK is of the opinion that the Court should grant a rehearing and a stay pending final disposition of the case. But since a sufficient number do not vote for a rehearing, he is willing to join those who wish to hear argument on the question of a stay.

"MR. JUSTICE DOUGLAS would grant a stay and hear the case on the merits, as he thinks the petition for certiorari and the petition for rehearing present substantial questions. But since the Court has

pending petition for rehearing as to the May 25, 1953, denial of certiorari, was also denied.[8] Thus the Court had in effect, disposed of all collateral attacks upon the sentence then pending in the courts—as to the first § 2255 motion by adhering to its original denial of certiorari and as to the three subsequent decisions of the Court of Appeals in the further collateral proceedings by denying a stay, a decision which showed that the Court saw no substantial question in those proceedings to be preserved for its further consideration.

Just a moment before adjournment of the 1952 Term, on June 15, 1953, a petition for an original writ of habeas corpus, including a request for a stay, was presented to the Court. On account of the imminence of the execution, counsel urged immediate action. They were advised that prompt consideration would be given to the application. The Court met in Special Term on the afternoon

decided not to take the case, there would be no end served by hearing oral argument on the motion for a stay. For the motion presents no new substantial question not presented by the petition for certiorari and by the petition for rehearing."

[8] 345 U. S. 1003. The full text of the order, Journal, June 15, 1953, p. 250, reads:

"Petition for rehearing denied. Mr. Justice Frankfurter deems it appropriate to state once more that the reasons that preclude publication by the Court, as a general practice, of votes on petition for certiorari guide him in all cases, so that it has been his 'unbroken practice not to note dissent from the Court's disposition of petitions for certiorari.' *Chemical Bank Co.* v. *Investors,* 343 U. S. 982; *Maryland* v. *Baltimore Radio Show,* 338 U. S. 912; *Darr* v. *Burford,* 339 U. S. 200, 227; *Agoston* v. *Pennsylvania,* 340 U. S. 844; *Bondholders, Inc.* v. *Powell,* 342 U. S. 921; *Rosenberg* v. *United States,* 344 U. S. 889, 345 U. S. 965. Partial disclosure of votes on successive stages of a certiorari proceeding does not present an accurate picture of what took place.

"Mr. Justice Black is of the opinion the petition for rehearing should be granted."

of that day and denied the application.⁹ The Special
Term was then adjourned.

Late on June 15, 1953, counsel for the defendants ap-
plied to MR. JUSTICE DOUGLAS for a stay. On June 16,
1953, counsel representing one Edelman, who described
himself as "next friend" to the Rosenbergs, presented to
MR. JUSTICE DOUGLAS a petition for habeas corpus. That
petition included a prayer for a stay. More than two
months before their appearance before MR. JUSTICE
DOUGLAS, Edelman's attorneys had asked counsel for the
Rosenbergs to raise the very question which they urged
upon MR. JUSTICE DOUGLAS. The argument was not
adopted at that time by counsel for the defendants.¹⁰ In

---

[9] 346 U. S. 271. The full text of the order, Journal, June 15, 1953,
p. 256, reads:

"The motion for leave to file petition for an original writ of habeas
corpus is denied. Mr. Justice Black dissents.

"Mr. Justice Frankfurter:

" 'The disposition of an application to this Court for habeas corpus
is so rarely to be made by this Court directly that Congress has given
the Court authority to transfer such an application to an appropriate
district court. 28 U. S. C., § 2241. I do not favor such a disposition
of this application because the substance of the allegations now made
has already been considered by the District Court for the Southern
District of New York and on review by the Court of Appeals for
the Second Circuit. Neither can I join the Court in denying the
application without more. I would set the application down for
hearing before the full Court tomorrow forenoon. Oral argument
frequently has a force beyond what the written word conveys.' "

[10] Counsel for the Rosenbergs was aware of the existence of the
Atomic Energy Act long before receiving the suggestion from counsel
for Edelman. One argument, *inter alia*, advanced in the original
certiorari petition, which was filed June 7, 1952, was that the sen-
tence of death constituted cruel and unusual punishment in violation
of the Eighth Amendment of the Constitution. The requirement
of the Atomic Energy Act of an intent to injure the United States
as a prerequisite to the death penalty (42 U. S. C. § 1810 (b) (2) and
(3) and § 1816) was cited in the petition in support of the cruel
and unusual punishment argument. In the petition for certiorari,

this recitation of facts, we do not hold in this case that a waiver of this claim precluded its consideration.

On the morning of June 17, 1953, MR. JUSTICE DOUGLAS denied the stay requested by counsel for the defendants, since it raised questions already passed upon by the Court.

Edelman's counsel raised the claim that the Atomic Energy Act of 1946, 42 U. S. C. § 1810 (b)(2) and (3), superseded the Espionage Act and rendered the District Court without power to impose the death sentence. MR. JUSTICE DOUGLAS was of the opinion that this contention posed a substantial question; he denied the application for habeas corpus, but granted a stay, effective until the applicability of the Atomic Energy Act could be determined in the District Court and the Court of Appeals.

The Attorney General then applied to the Court, asking that we convene a Special Term of Court and vacate the stay. The Court was convened in Special Term on June 18, 1953, MR. JUSTICE BLACK objecting.

Thus we were brought to this particular proceeding. The case was argued for several hours on June 18. The Court then recessed and deliberated in conference for several hours. During the next morning the Court held another conference, and then met at noon and announced its decision in a per curiam opinion. We vacated the stay.

Immediately following the announcement of this decision, counsel for the Rosenbergs moved for a further stay asking that the Court grant them an additional period in which they might seek executive clemency. Counsel for Edelman moved that the Court reconsider the question of its power to vacate the stay. After a recess and

as well as in the petition for rehearing, filed October 28, 1952, in regard to other contentions, counsel for the defendants cited Newman, Control of Information Relating to Atomic Energy, 56 Yale L. J. 769. That article deals extensively with the relationship of sentences under the Atomic Energy Act to those under the Espionage Act.

deliberation, the Court denied both motions, with MR. JUSTICE BLACK noting dissents, and MR. JUSTICE FRANK-FURTER appending a separate memorandum to each order.[11]

---

[11] The order denying a further stay, 346 U. S. 322, reads:

"Motion of the petitioners for a further stay of the execution, as set forth in the written motion, is denied.

"MR. JUSTICE BLACK dissents.

"MR. JUSTICE FRANKFURTER.

"On the assumption that the sentences against the Rosenbergs are to be carried out at 11 o'clock tonight, their counsel ask this Court to stay their execution until opportunity has been afforded to them to invoke the constitutional prerogative of clemency. The action of this Court, and the division of opinion in vacating the stay granted by MR. JUSTICE DOUGLAS, are, of course, a factor in the situation, which arose within the last hour. It is not for this Court even remotely to enter into the domain of clemency reserved by the Constitution exclusively to the President. But the Court must properly take into account the possible consequences of a stay or of a denial of a stay of execution of death sentences upon making an appeal for executive clemency. Were it established that counsel are correct in their assumption that the sentences of death are to be carried out at 11 p. m. tonight, I believe that it would be right and proper for this Court formally to grant a stay with a proper time-limit to give appropriate opportunity for the process of executive clemency to operate. I justifiably assume, however, that the time for the execution has not been fixed as of 11 o'clock tonight. Of course I respectfully assume that appropriate consideration will be given to a clemency application by the authority constitutionally charged with the clemency function."

The order, 346 U. S. 324, denying a rehearing on the question of our power to vacate the stay reads:

"The motion for reconsideration of the question of the Court's power to vacate MR. JUSTICE DOUGLAS' stay order and hear oral argument is denied.

"MR. JUSTICE BLACK dissents.

"MR. JUSTICE FRANKFURTER desires that it be noted that he too would deny the motion to reconsider the power of this Court to review MR. JUSTICE DOUGLAS' order to stay the execution, but not because he thinks the matter is free from doubt. See his dissenting

The Special Term was adjourned. Thereafter executive clemency was denied. The sentence of death was carried out.

We have recited the history of this unusual case at length because we think a full recitation is necessary to a proper understanding of the decision rendered. We proceed to discuss two questions of power: the power of MR. JUSTICE DOUGLAS to issue the stay; and the power of this Court to decide, in this proceeding, the question preserved by the stay and the vacation of the stay.

MR. JUSTICE DOUGLAS had power to issue the stay. No one has disputed this, and we think the proposition is indisputable.

Stays are part of the "traditional equipment for the administration of justice." *Scripps-Howard Radio, Inc.* v. *Federal Communications Commission,* 316 U. S. 4, 9–10 (1942). The individual Justices of this Court have regularly issued them, and the exercise of that power is vital to the proper functioning of our jurisdiction.

Confronted with the question of the applicability of the Atomic Energy Act, MR. JUSTICE DOUGLAS wrote:

> "I have serious doubts whether this death sentence may be imposed for this offense except and unless a jury recommends it. The Rosenbergs should have an opportunity to litigate that issue.
>
> "I will not issue the writ of *habeas corpus.* But I will grant a stay effective until the question of the applicability of the penal provisions of § 10 of the Atomic Energy Act to this case can be determined by the District Court and the Court of Appeals, after which the question of a further stay will be open to the Court of Appeals or to a member of this Court in the usual order." (See *post,* p. 321.)

opinion in *Ex parte Peru,* 318 U. S. 578, 590, in connection with *Lambert* v. *Barrett,* 157 U. S. 697, and *Carper* v. *Fitzgerald,* 121 U. S. 87."

After hearing argument on this question, we did not entertain the serious doubts which MR. JUSTICE DOUGLAS had.

We turn next to a consideration of our power to decide, in this proceeding, the question preserved by the stay. It is true that the full Court has made no practice of vacating stays issued by single Justices, although it has entertained motions for such relief.[12] But reference to this practice does not prove the nonexistence of the power; it only demonstrates that the circumstances must be unusual before the Court, in its discretion, will exercise its power.

The power which we exercised in this case derives from this Court's role as the final forum to render the ultimate answer to the question which was preserved by the stay.

Thus MR. JUSTICE DOUGLAS, in issuing the stay, did not act to grant some form of amnesty or last-minute reprieve to the defendants; he simply acted to protect jurisdiction over the case, to maintain the status quo until a conclusive answer could be given to the question which had been urged in the defendants' behalf. In the exercise of our jurisdiction to decide the question which was preserved for decision, it lay within our power to bring the new claim before us and examine its merits without further delay. In considering this question, the Court carried out the limited purpose for which MR. JUSTICE DOUGLAS issued the stay.

The existence of our power was clear, and so also, we think, was the necessity for its exercise. Yet it was urged at argument that the Court, as a matter of discretion if not of power, should refrain from immediately deciding the merits of the issue which had been preserved by the stay. Indeed, the reasons for refusing, as a matter of practice, to vacate stays issued by single Justices are

---

[12] See, e. g., Land v. Dollar, 341 U. S. 737 (1951); Johnson v. Stevenson, 335 U. S. 801 (1948).

obvious enough. Ordinarily the stays of individual Justices should stand until the grounds upon which they have issued can be reviewed through regular appellate processes.

In this case, however, we deemed it proper and necessary to convene the Court to consider the Attorney General's urgent application. MR. JUSTICE DOUGLAS denied the petition for habeas corpus. His grant of a stay called for initiation of a new proceeding in the District Court. It followed hard on the heels of our orders denying a rehearing, denying a further stay and denying a motion for leave to file a petition for habeas corpus in which a stay was requested. The stay issued by MR. JUSTICE DOUGLAS was based, of course, on a new claim—a question which had not been considered in any prior proceeding.

This Court has the responsibility to supervise the administration of criminal justice by the federal judiciary. This includes the duty to see that the laws are not only enforced by fair proceedings, but also that the punishments prescribed by the laws are enforced with a reasonable degree of promptness and certainty. The stay which had been issued promised many more months of litigation in a case which had otherwise run its full course.

The question preserved for adjudication by the stay was entirely legal; there was no need to resort to the fact-finding processes of the District Court; it was a question of statutory construction which this Court was equipped to answer. We decided that a proper administration of the laws required the Court to consider that question forthwith.

This brought us to the merits. Our decision was summarized in our per curiam opinion.[13] We held that the Atomic Energy Act of 1946 did not displace the Espionage Act. We held that this issue raised no doubts of such magnitude as to require further proceedings before

[13] *Post,* p. 288.

execution of the District Court's original mandate—a mandate which had been affirmed on appeal and sustained thereafter despite continuous collateral attack.

More complete statements of the reasons for our decision are set forth in the opinions of MR. JUSTICE JACKSON [14] and MR. JUSTICE CLARK.[15] We need not reiterate here what has been said in those opinions. It is enough to add that, in our view, the ultimate decision was clear. Accordingly, we vacated the stay.

PER CURIAM.[*]

We convened a Special Term of the Court to consider an application by the Attorney General (1) to review the stay of execution of Julius Rosenberg and Ethel Rosenberg, granted by MR. JUSTICE DOUGLAS on June 17, 1953, or (2) for reconsideration and reaffirmance of this Court's order in No. 1, Misc., June 15 Special Term, 1953, *Julius Rosenberg and Ethel Rosenberg, petitioners,* v. *Wilford L. Denno, Warden of Sing Sing Prison,* denying a stay, *ante,* p. 271.

The Acting Solicitor General agrees and we do not doubt that MR. JUSTICE DOUGLAS had power to issue the stay in these proceedings. There is no dispute that a stay should issue only if there is a substantial question to be preserved for further proceedings in the courts.

The question which has been and now is urged as being substantial is whether the provisions of the Atomic Energy Act of 1946, 42 U. S. C. § 1810 (b)(2), (3), rendered the District Court powerless to impose the death sentence under the Espionage Act of 1917, 50 U. S. C. §§ 32 (a), 34, under which statute the indictment was laid.

Although this question was raised and presented for the first time to MR. JUSTICE DOUGLAS by counsel who

---

[14] *Post,* p. 289.

[15] *Post,* p. 293.

[*][NOTE: This opinion was delivered June 19, 1953.]

have never been employed by the Rosenbergs, and who heretofore have not participated in this case, the full Court has considered it on its merits.

We think the question is not substantial. We think further proceedings to litigate it are unwarranted. A conspiracy was charged and proved to violate the Espionage Act in wartime. The Atomic Energy Act did not repeal or limit the provisions of the Espionage Act. Accordingly, we vacate the stay entered by MR. JUSTICE DOUGLAS on June 17, 1953.

We are entering this order in advance of the preparation of full opinions which will be filed with the Clerk.

*Stay granted by Mr. Justice Douglas vacated.*

MR. JUSTICE FRANKFURTER is of opinion that the questions raised for the first time yesterday before the full Court by the application of the Attorney General are complicated and novel. He believes that, in order to enable the Court to adjudicate these issues upon adequate deliberation, this application should be disposed of only after opportunity has been afforded to counsel for both sides to make an adequate study and presentation. In due course, MR. JUSTICE FRANKFURTER will set forth more specifically the grounds for this position.*

By MR. JUSTICE JACKSON, whom THE CHIEF JUSTICE, MR. JUSTICE REED, MR. JUSTICE BURTON, MR. JUSTICE CLARK, and MR. JUSTICE MINTON join.†

This stay was granted upon such legal grounds that this Court cannot allow it to stand as the basis upon which lower courts must conduct further long-drawn proceedings.

---

*[See *post*, p. 301.]

†[NOTE: This opinion was delivered June 19, 1953.]

The sole ground stated was that the sentence may be governed by the Atomic Energy Act of August 1, 1946, instead of by the earlier Espionage Act. The crime here involved was commenced June 6, 1944. This was more than two years before the Atomic Energy Act was passed. All overt acts relating to atomic energy on which the Government relies took place as early as January 1945.

The Constitution, Art. I, § 9, prohibits passage of any *ex post facto* Act. If Congress had tried in 1946 to make transactions of 1944 and 1945 offenses, we would have been obliged to set such an Act aside. To open the door to retroactive criminal statutes would rightly be regarded as a most serious blow to one of the civil liberties protected by our Constitution. Yet the sole ground of this stay is that the Atomic Energy Act may have retrospective application to conspiracies in which the only overt acts were committed before that statute was enacted.

We join in the opinion by MR. JUSTICE CLARK and agree that the Atomic Energy Act does not, by text or intention, supersede the earlier Espionage Act. It does not purport to repeal the earlier Act, nor afford any grounds for spelling out a repeal by implication. Each Act is complete in itself and each has its own reason for existence and field of operation. Certainly prosecution, conviction and sentence under the law in existence at the time of the overt acts are not improper. It is obvious that an attempt to prosecute under the later Act would in all probability fail.

This stay is not and could not be based upon any doubt that a legal conviction was had under the Espionage Act. Application here for review of the Court of Appeals decision affirming the conviction was refused, 344 U. S. 838, and rehearing later denied, 344 U. S. 889.

Later, responsible and authorized counsel raised, among other issues, questions as to the sentence, and an applica-

tion was made for stay until they could be heard. The application was referred to the full Court, with the recommendation that the full Court hold immediate hearing and as an institution make a prompt and final disposition of all questions. This was supported by four Justices and failed for want of one more, MR. JUSTICE DOUGLAS recording his view that "there would be no end served by hearing oral argument on the motion for a stay." 345 U. S. 989.

Thus, after being in some form before this Court over nine months, the merits of all questions raised by the Rosenbergs' counsel had been passed upon, or foreclosed by denials. However, on this application we have heard and decided (since it had been the ground for granting the stay) a new contention, despite the irregular manner in which it was originally presented.

This is an important procedural matter of which we disapprove. The stay was granted solely on the petition of one Edelman, who sought to appear as "next friend" of the Rosenbergs. Of course, there is power to allow such an appearance, under circumstances such as incapacity of the prisoner or isolation from counsel, which make it appropriate to enable the Court to hear a prisoner's case. But in these circumstances the order which grants Edelman standing further to litigate this case in the lower courts cannot be justified.

Edelman is a stranger to the Rosenbergs and to their case. His intervention was unauthorized by them and originally opposed by their counsel. What may be Edelman's purpose in getting himself into this litigation is not explained, although inquiry was made at the bar. It does not appear that his own record is entirely clear or that he would be a helpful or chosen champion. See *Edelman* v. *California,* 344 U. S. 357.

The attorneys who appear for Edelman tell us that for two months they tried to get the authorized counsel for

the Rosenbergs to raise this issue but were refused. They also inform us that they have eleven more points to present hereafter, although the authorized counsel do not appear to have approved such issues.

The Rosenbergs throughout have had able and zealous counsel of their own choice. These attorneys originally thought this point had no merit and perhaps also that it would obscure the better points on which they were endeavoring to procure a hearing here. Of course, after a Justice of this Court had granted Edelman standing to raise the question and indicated that he is impressed by its substantiality, counsel adopted the argument and it became necessary for us to review it. They also shared their time and the counsel table with the Edelman lawyers thus admitted as attorneys-at-large to their case. The lawyers who have ably and courageously fought the Rosenbergs' battle throughout then listened at this bar to the newly imported counsel make an argument which plainly implied lack of understanding or zeal on the part of the retained counsel. They simply had been elbowed out of the control of their case.

Every lawyer familiar with the workings of our criminal courts and the habits of our bar will agree that this precedent presents a threat to orderly and responsible representation of accused persons and the right of themselves and their counsel to control their own cases. The lower court refused to accept Edelman's intrusion but by the order in question must accept him as having standing to take part in, or to take over, the Rosenbergs' case. That such disorderly intervention is more likely to prejudice than to help the representation of accused persons in highly publicized cases is self-evident. We discountenance this practice.

Vacating this stay is not to be construed as indorsing the wisdom or appropriateness to this case of a death sen-

tence. That sentence, however, is permitted by law and, as was previously pointed out, is therefore not within this Court's power of revision. 344 U. S. 889, 890.

MR. JUSTICE CLARK, with whom THE CHIEF JUSTICE, MR. JUSTICE REED, MR. JUSTICE JACKSON, MR. JUSTICE BURTON, and MR. JUSTICE MINTON join.*

Seven times now have the defendants been before this Court. In addition, THE CHIEF JUSTICE, as well as individual Justices, has considered applications by the defendants. The Court of Appeals and the District Court have likewise given careful consideration to even more numerous applications than has this Court.

The defendants were sentenced to death on April 5, 1951. Beginning with our refusal to review the conviction and sentence in October 1952, each of the Justices has given the most painstaking consideration to the case. In fact, all during the past Term of this Court one or another facet of this litigation occupied the attention of the Court. At a Special Term on June 15, 1953, we denied for the sixth time the defendants' plea. The next day an application was presented to MR. JUSTICE DOUGLAS, contending that the penalty provisions of the Atomic Energy Act governed this prosecution; and that, since the jury did not find that the defendants committed the charged acts with intent to injure the United States nor recommend the imposition of the death penalty, the court had no power to impose the sentence of death. After a hearing MR. JUSTICE DOUGLAS, finding that the contention had merit, granted a stay of execution. The Court convened in Special Term to review that determination. Cf. Ex parte Quirin, 317 U. S. 1 (1942).

---

*[NOTE: This opinion was delivered June 19, 1953.]

Human lives are at stake; we need not turn this decision on fine points of procedure or a party's technical standing to claim relief. Nor did MR. JUSTICE DOUGLAS lack the power and, in view of his firm belief that the legal issues tendered him were substantial, he even had the duty to grant a temporary stay. But for me the short answer to the contention that the Atomic Energy Act of 1946 may invalidate defendants' death sentence is that the Atomic Energy Act cannot here apply. It is true that § 10 (b) (2) and (3) of that Act authorizes capital punishment only upon recommendation of a jury and a finding that the offense was committed with intent to injure the United States. 60 Stat. 755, 766, 42 U. S. C. § 1810 (b) (2), (3). (Notably, by that statute the death penalty may be imposed for *peacetime* offenses as well, thus exceeding in harshness the penalties provided by the Espionage Act.) This prosecution, however, charged a wartime violation of the Espionage Act of 1917 under which these elements are not prerequisite to a sentence of death. Where Congress by more than one statute proscribes a private course of conduct, the Government may choose to invoke either applicable law: "At least where different proof is required for each offense, a single act or transaction may violate more than one criminal statute." *United States* v. *Beacon Brass Co.,* 344 U. S. 43, 45 (1952); see also *United States* v. *Noveck,* 273 U. S. 202, 206 (1927); *Gavieres* v. *United States,* 220 U. S. 338 (1911). Nor does the partial overlap of two statutes necessarily work a *pro tanto* repealer of the earlier Act. *Ibid.* "It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible . . . . The intention of the legislature to repeal 'must be clear and manifest.' . . . It is not sufficient . . . 'to establish that subsequent laws cover some or even all of the cases provided for by [the prior

act] ; for they may be merely affirmative, or cumulative, or auxiliary.' There must be 'a positive repugnancy between the provisions of the new law, and those of the old.' " *United States* v. *Borden Co.*, 308 U. S. 188, 198 (1939). Otherwise the Government when charging a conspiracy to transmit both atomic and non-atomic secrets would have to split its prosecution into two alleged crimes. Section 10 (b)(6) of the Atomic Energy Act itself, moreover, expressly provides that § 10 "shall not exclude the applicable provisions of any other laws . . . ," an unmistakable reference to the 1917 Espionage Act.* Therefore this section of the Atomic Energy Act, instead of repealing the penalty provisions of the Espionage Act, in fact preserves them in undiminished force. Thus there is no warrant for superimposing the penalty provisions of the later Act upon the earlier law.

In any event, the Government could not have invoked the Atomic Energy Act against these defendants. The crux of the charge alleged overt acts committed in 1944 and 1945, years before that Act went into effect. While some overt acts did in fact take place as late as 1950, they related principally to defendants' efforts to avoid detec-

---

*See Newman and Miller, The Control of Atomic Energy, p. 235 (1948) ; Newman, Control of Information Relating to Atomic Energy, 56 Yale L. J. 769, 790 (1947).

While § 10 (b)(6) additionally contains an exception, providing that "no Government agency shall take any action under such other laws inconsistent with the provisions of this section," that exception is not applicable here. As disclosed by the legislative history of the Act (which must be read to refer to § 10 (b)(6)), it "prohibits any agency from placing information in a restricted category under the authority of this or any other law once such information has been released from the category by official action of the Atomic Energy Commission." S. Rep. No. 1211, 79th Cong., 2d Sess., p. 24. And see 92 Cong. Rec. 6096 (1946): "Section 10 also establishes the Commission as the top authority in the Government with reference to what will or will not remain as restricted data . . . ."

tion and prosecution of earlier deeds. Grave doubts of unconstitutional *ex post facto* criminality would have attended any prosecution under that statute for transmitting atomic secrets before 1946. Since the Atomic Energy Act thus cannot cover the offenses charged, the alleged inconsistency of its penalty provisions with those of the Espionage Act cannot be sustained.

Our liberty is maintained only so long as justice is secure. To permit our judicial processes to be used to obstruct the course of justice destroys our freedom. Over two years ago the Rosenbergs were found guilty by a jury of a grave offense in time of war. Unlike other litigants they have had the attention of this Court seven times; each time their pleas have been denied. Though the penalty is great and our responsibility heavy, our duty is clear.

MR. JUSTICE BLACK, dissenting.*

It is argued that the Court is not asked to "act with unseemly haste to avoid postponement of a scheduled execution." I do not agree. I do not believe that Government counsel or this Court has had time or an adequate opportunity to investigate and decide the very serious question raised in asking this Court to vacate the stay granted by MR. JUSTICE DOUGLAS. The oral arguments have been wholly unsatisfactory due entirely to the lack of time for preparation by counsel for the Government and counsel for the defendants. Certainly the time has been too short for me to give this question the study it deserves. The following are some of the reasons why I think the Court should not at this time upset the considered rulings of MR. JUSTICE DOUGLAS. I add my regret that the rush of this case has deprived me of any oppor-

---

*[NOTE: This opinion was delivered June 19, 1953.]

tunity to do more at this time than hastily sketch my view on the important questions raised.

*First.* The Government argues that this Court has power to set aside the stay granted by Mr. Justice Douglas. I think this is doubtful. I have found no statute or rule of court which permits the full Court to set aside a mere temporary stay entered by a Justice in obedience to his statutory obligations.* Moreover, it is a commonplace for judges to grant stays in vacation. This is a healthy and necessary Court custom. There may have been prior instances where vacation stays of individual Justices have been set aside by the full Court before the next regular term, but no such cases have been pointed out in the Solicitor General's argument and I have found none. So far as I can tell, the Court's action here is unprecedented.

But if the Court could find statutory or constitutional power to vacate this stay, there are many reasons why I believe that power should not be exercised. Concededly,

---

*The Government cites 28 U. S. C. § 2106 and 28 U. S. C. § 1651 as statutory authority for the Court's action in dissolving the stay granted by Mr. Justice Douglas. Neither statute authorizes the Court's action. Section 2106 provides:

"The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

But the plain words of this section exclude the case here. Those words say this Court may affirm, etc., any "judgment, decree, or order *of a court* . . . ." But no *court* order is before us. Nor can the Government take comfort in § 1651. It says only that "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The statute says nothing about dissolution of a stay order.

an individual Justice has power to grant stays where substantial questions are raised. He not merely has power to do so; there is a serious obligation upon him to grant a stay where new substantial questions are presented. Where the life or death of citizens is involved, that obligation is all the heavier. Surely the Court is not here establishing a precedent which will require it to call extra sessions during vacation every time a federal or state official asks it to hasten the electrocution of defendants without affording this Court adequate time or opportunity for exploration and study of serious legal questions. It is not inappropriate to point out that in *Lambert* v. *Barrett,* 157 U. S. 697, decided in 1895 and never overruled, this Court held that it had no jurisdiction over an appeal from a habeas corpus order of a circuit judge entered in chambers. The stay order in this case derives from petitions for habeas corpus and was entered by MR. JUSTICE DOUGLAS in chambers.

*Second.* The stay of MR. JUSTICE DOUGLAS in this case was based on his studied conclusion that there were substantial grounds to believe the death sentences of these two people were imposed by the District Judge in violation of law. I agree with MR. JUSTICE DOUGLAS. The Government contends, however, that the death sentences were properly imposed under the Espionage Act of 1917, 50 U. S. C. § 32, which gives a district judge unconditional power to impose the death penalty for violation of that Act. But the Atomic Energy Act, 42 U. S. C. § 1810, passed in 1946, appears to have taken the death sentencing power from district judges, in cases of atomic energy espionage, except where juries recommend a death sentence and where there are allegations and proof that atomic energy information has been unlawfully transmitted with intent to injure the United States. The indictment here charged a conspiracy alleged to have continued from June 6, 1944, to June 16, 1950. Thus the

alleged conspiracy covered one period of conduct where the 1917 Act plainly governed and another period of conduct after the Atomic Energy Act went into effect. The Rosenbergs were charged with conspiracy to disclose atomic secrets as well as other kinds of secrets. Under these circumstances it would more nearly fit into the general canons of construction to hold that a District Court could impose sentence only under the less harsh statute.

I am not unaware of the Government's argument that this Court can and should give full effect to both these statutes, one which deprives the District Court of unconditional power to impose the death sentence and one which grants such unconditional power. This would be a strange argument in any case but it seems still stranger to me in a case which involves matters of life and death. The stay of MR. JUSTICE DOUGLAS is based entirely on his desire to have this matter passed upon in due course and after proper deliberation in a habeas corpus proceeding brought in district court and followed through to this Court. That is as it should be. Judicial haste is peculiarly out of place where the death penalty has been imposed for conduct part of which took place at a time when the Congress appears to have barred the imposition of the death penalty by district judges acting without a jury's recommendation. And it seems to me that this Court has not had time or opportunity for sufficient study to give the kind of informed decision on this important question it would if the case should take its regular course.

*Third.* I am aware also of the argument that MR. JUSTICE DOUGLAS should not have considered and that we should not now consider the point here involved because the Rosenbergs' lawyers had not originally raised it on appeal. I cannot believe, however, that if the sentence of a citizen to death is plainly illegal, this Court would allow that citizen to be executed on the grounds that his

lawyers had "waived" plain error. An illegal execution is no less illegal because a technical ground of "waiver" is assigned to justify it. Compare *Bowen* v. *Johnston,* 306 U. S. 19, 26. After having seen the Court's order I find that it appears to agree with this view.

*Fourth.* The inadequate oral arguments before this Court have left me with the firm conviction that the applicability of the penal provisions of the Atomic Energy Act of 1946 to this case presents a substantial and serious question. This I think is fully demonstrated by the opinion written by MR. JUSTICE DOUGLAS when he granted the stay order, a copy of which is attached by him as an appendix to his opinion with which opinion I agree. It is my view based on the limited arguments we have heard that after passage of the Atomic Energy Act of 1946 it was unlawful for a judge to impose the death penalty for unlawful transmittal of atomic secrets unless such a penalty was recommended by the jury trying the case. I think this question should be decided only after time has been afforded counsel for the Government and for the defendants to make more informed arguments than we have yet heard and after this Court has had an opportunity to give more deliberation than it has given up to this date. This I think would be more nearly in harmony with the best judicial traditions.

I may add that I voted to grant certiorari originally in this case. That petition for certiorari challenged the fairness of the trial. It also challenged the right of the Government to try these defendants except under the limited rules prescribed by the Constitution defining the offense of treason. These I then believed to be important questions. In motions for rehearing the arguments as to the unfairness of the trial were expanded and I again voted for review. I have long thought that the practice of some of the states to require an automatic review by the

highest court of the state in cases which involve the death penalty was a good practice.

It is not amiss to point out that this Court has never reviewed this record and has never affirmed the fairness of the trial below. Without an affirmance of the fairness of the trial by the highest court of the land there may always be questions as to whether these executions were legally and rightfully carried out. I would still grant certiorari and let this Court approve or disapprove the fairness of the trials.

MR. JUSTICE FRANKFURTER, dissenting.*

On an application made after adjournment of the Court, MR. JUSTICE DOUGLAS granted a stay of execution of the death sentences of Julius and Ethel Rosenberg. On the afternoon of the same day, the Attorney General of the United States filed an application to convene the Court in Special Term with a view to vacating the stay. It was not until late that afternoon that arrangements for convening the Court the following day could be completed. Less than three hours before the Court convened at about noon on Thursday, June 18, and in the case of some members of the Court only a few minutes before noon, did the individual members of the Court receive the Government's application and brief bearing on the propriety and reviewability of MR. JUSTICE DOUGLAS' order.

There followed three hours of argument on jurisdictional and procedural issues as well as on the issue of the substantiality of the question of law raised by the application for a stay which led to MR. JUSTICE DOUGLAS' order. In vacating that order the Court found no infirmity in it on any jurisdictional or procedural ground. The Court recognized MR. JUSTICE DOUGLAS' power to

---

*[NOTE: This opinion was filed June 22, 1953.]

entertain the application for a stay; [1] his power to consider a question though raised by counsel not of record; his power to consider a question not heretofore urged, when it concerned the legality of a sentence. See *Ex parte Lange,* 18 Wall. 163.

Thus the only issue in the case was whether the question on the basis of which MR. JUSTICE DOUGLAS acted was patently frivolous or was sufficiently serious to require the judicial process to run its course with the deliberation necessary for confident judgment. That is the sole issue to which this opinion is addressed. All else is irrelevant. Once the Court conceded, as it did, that the substantiality of the question raised before MR. JUSTICE DOUGLAS was the sole issue, it became wholly immaterial how many other questions were raised and considered on their merits in the District Court and in the Court of Appeals, or how many times review was sought on these questions and refused by this Court. It was equally immaterial how long a time intervened between the original trial of this case and the present proceeding, and immaterial that this was a last-minute effort almost on the eve of the executions. To allow such irrelevancies to enter the mind not unnaturally tends to bend the judicial judgment in a false direction.

And so I turn to what is for me controlling in this case. I summarized my position in the following notation on the Court's order:

"MR. JUSTICE FRANKFURTER is of opinion that the questions raised for the first time yesterday before the full Court by the application of the Attorney General are complicated and novel. He believes

---

[1] Naturally enough the Government and the Court "do not doubt that MR. JUSTICE DOUGLAS had power to issue the stay in these proceedings." How could there be doubt about a power that has existed uninterruptedly ever since Congress gave it by the Act of September 24, 1789? Section 14 of the First Judiciary Act, 1 Stat. 73, 81–82.

that, in order to enable the Court to adjudicate these issues upon adequate deliberation, this application should be disposed of only after opportunity has been afforded to counsel for both sides to make an adequate study and presentation. In due course, MR. JUSTICE FRANKFURTER will set forth more specifically the grounds for this position."

Painful as it is, I am bound to say that circumstances precluded what to me are indispensable conditions for solid judicial judgment. They precluded me, and now preclude me, from saying that the legal issue that was raised before MR. JUSTICE DOUGLAS was without substance. Let me set forth some of the difficulties that immediately arise upon consideration of that issue.

The basis on which a jury convicts is authoritatively to be taken from what the judge tells the jury. In this case, the jury's attention was especially directed to the fact that the charge was a conspiracy to obtain and transmit classified materials pertaining in part to the atomic bomb:

"Bear in mind—please listen to this, ladies and gentlemen—that the Government contends that the conspiracy was one to obtain not only atomic bomb information, but other secret and classified information; that the information including the report regarding fire-control equipment requested of Elitcher by Sobell or Rosenberg was classified; that the atomic bomb information transmitted by the Rosenbergs was classified as top secret; that based on Rosenberg's alleged statements to Greenglass, other secret information such as mathematical data on atomic energy for airplanes, information relating to a 'sky platform' project and other information was obtained by Julius Rosenberg from scientist contacts in the country." R. 1557.

And the indictment charged that the conspiracy continued from 1944 to 1950. Such "averments of time in the indictment are expected and intended to be proved as laid." *United States* v. *Kissel*, 218 U. S. 601, 609. Indeed, the judge told the jury: "You must first determine from all the evidence in the case, relating to the period of time defined in the indictment, whether or not a conspiracy existed." R. 1552. Only one conspiracy could have been found by the jury to have existed, and that was the conspiracy averred in the indictment, a conspiracy continuous from a date certain in 1944 to a date certain in 1950. The Government could of course have charged a conspiracy beginning in 1944 and ending on July 31, 1946, the day before the Atomic Energy Act came into effect. It did not do so. That fact is of decisive importance. The consequences of a conspiracy that was afoot for six years might have been vastly different from those of a conspiracy that terminated within two years, that is, by the time Congress devised legislation to protect atomic energy secrets.

It is suggested that the overt acts laid in the indictment all occurred before the effective date of the Atomic Energy Act and that hence the indictment did not charge any offense committed after that effective date. But, again, the offense charged in the indictment was a conspiracy, not one or more overt acts.[2] As the judge told the jury, they had to find a conspiracy in order to convict,

---

[2] It is worth noting that under the Atomic Energy Act it is very probably not necessary, since the Act, unlike the Espionage Act, does not make it a requirement, to prove overt acts in furtherance of a conspiracy. Cf. *Singer* v. *United States*, 323 U. S. 338. If so, under the Atomic Energy Act it would not have been necessary to allege or prove an overt act involving atomic espionage subsequent to 1946 in order to obtain a conviction on a conspiracy indictment such as the one here. It is not without significance that the relevance of this point was not considered by the Government in its argument or sub-

a conspiracy aimed principally at obtaining atomic secrets and characterized as such by the overt acts alleged, but a conspiracy, I cannot too often repeat, alleged to have been continuous to a date certain in 1950. The Government having tried the Rosenbergs for a conspiracy, continuing from 1944 to 1950, to reveal atomic secrets among other things, it flies in the face of the charge made, the evidence adduced and the basis on which the conviction was secured now to contend that the terminal date of the Rosenberg conspiracy preceded the effective date of the Atomic Energy Act.

It thus appears—although, of course, I would feel more secure in my conviction had I had the opportunity to make a thorough study of the lengthy record in this case—that the conspiracy with which the Rosenbergs were charged is one falling in part within the terms of the Atomic Energy Act, passed by Congress in 1946 and specifically dealing with classified information pertaining to the recent developments in atomic energy. There remains the question whether the sentence for such a conspiracy could be imposed under the Espionage Act.

Congress was not content with the penal provisions of the Espionage Act of 1917 to prevent disclosure of atomic energy information. The relevant provisions of the Atomic Energy Act of 1946 differ in several respects from those of the Espionage Act. For one thing the 1946 Act makes possible the death penalty for disclosures in time of peace as well as in war. Some disclosures which fell generally within the Espionage Act now specifically fall under § 10 of the Atomic Energy Act. The decisive thing in this case is that under the Espionage Act the power

---

mission. This is significant not because it discloses a failure of counsel, but because to require consideration of this and other points within twenty-four hours after a complex of problems was first put forward is to presuppose omniscient lawyers.

to impose a sentence of death was left exclusively to the discretion of the court, while under the Atomic Energy Act a sentence of death can be imposed only upon recommendation of the jury.

Surely it needs only statement that with such a drastic difference in the authority to take life between the Espionage Act and the Atomic Energy Act, it cannot be left within the discretion of a prosecutor whether the judge may impose the death sentence wholly on his own authority or whether he may do so only upon recommendation of the jury. Nothing can rest on the prosecutor's caprice in placing on the indictment the label of the 1917 Act or of the 1946 Act. To seek demonstration of such an absurdity, in defiance of our whole conception of impersonality in the criminal law, would be an exercise in self-stultification. The indorsement of an indictment, the theory under which the prosecutor is operating, his belief or error as to the statute which supports an indictment or under which sentences may be imposed, are all wholly immaterial.[3] See *Williams* v. *United States,* 168 U. S. 382, 389.

These considerations—the fact that Congress and not the whim of the prosecutor fixes sentences, that the allegations of an indictment are to be judged by the relevant statute under which punishment may be meted out and not by the design of the prosecutor or the assumption of the trial court—cut across all the talk about repeal

---

[3] "In order to determine whether an indictment charges an offense against the United States, designation by the pleader of the statute under which he purported to lay the charge is immaterial. He may have conceived the charge under one statute which would not sustain the indictment but it may nevertheless come within the terms of another statute. See *Williams* v. *United States,* 168 U. S. 382. On the other hand, an indictment may validly satisfy the statute under which the pleader proceeded, but other statutes not referred to by him may draw the sting of criminality from the allegations." *United States* v. *Hutcheson,* 312 U. S. 219, 229.

by implication and other empty generalities on statutory construction. Congress does not have to say in so many words that hereafter a judge cannot without jury recommendation impose a sentence of death on a charge of conspiracy that falls within the Atomic Energy Act. It is enough if in fact Congress has provided that hereafter such a death sentence is to depend on the will of the jury.

This much, at least, lies on the surface of an analysis of the two statutes. The Reports of this Court are replete with instances of marked division of opinion in construing criminal statutes; doubtful and ambiguous statutory language and like ambiguities in the interpretative materials that led to many of those divisions are certainly not more impressive, to say the least, than the ambiguities and difficulties here. See, *e. g., United States* v. *Dotterweich,* 320 U. S. 277; *United States* v. *Singer,* 323 U. S. 338; *United States* v. *Petrillo,* 332 U. S. 1; *United States* v. *C. I. O.,* 335 U. S. 106; *United States* v. *Williams,* 341 U. S. 70; *United States* v. *Hood,* 343 U. S. 148.

In all matters of statutory construction one goes, especially these days, to the history of the legislation and other illuminating materials. It is almost mathematically demonstrable that there just was not time within twelve waking hours to dig out, to assess, to assemble, and to formulate the meaning of legislative materials. Suffice it to say that such materials bearing on legislative purpose as a necessarily very limited inquiry has revealed do not justify certitude. See S. Rep. No. 1211, 79th Cong., 2d Sess. 23–24; 92 Cong. Rec. 6082, 6096, 9257, 10194; cf. *id.,* at 9481–9482. And an authoritative commentary on the Atomic Energy Act, written by counsel for the Senate Special Committee on Atomic Energy which drafted the statute, not only recognizes a compelling need for judicial decision in order to reconcile the conflicting penalty provisions of that Act and of the

Espionage Act but seems, as I read it, to point to the view that on facts like those of this case the Atomic Energy Act may well be found to apply to the exclusion of the Espionage Act.[4]   Newman, Control of Information Relating to Atomic Energy, 56 Yale L. J. 769.

Neither counsel nor the Court, in the time available, were able to go below the surface of the question raised

--------

[4] That the Atomic Energy Act is not a pellucid piece of draftsmanship so that he who runs may read is indicated by this general observation of Mr. Newman: "Skillful administration and careful judicial consideration will be needed to reconcile the apparent inconsistencies and to effect the evident intent of Congress—regardless of the labyrinth of confusion that inadequate drafting has created." 56 Yale L. J., at 791.

Some of the specific difficulties laid bare by Mr. Newman are of immediate relevance to the problem before the Court:

"It is reasonable to suppose that Congress did not intend to give the prosecuting attorney the option of moving under the Espionage Act instead of the Atomic Energy Act where an offense involving information relating to atomic energy is specifically described in the latter and only broadly and generically encompassed by the former. On the other hand this judgment creates an intellectual predicament. Its acceptance might mean that while the disclosure of information relating to the construction of a machine gun, may, under given circumstances, be punishable by death, the disclosure of information relating to the exact construction of an atomic bomb, would not, under the same circumstances, be punishable by more than 10 years' imprisonment.   But in spite of its anomalous consequences the conclusion seems inescapable.   When Congress adopted Section 10 of the Atomic Energy Act it intended to prescribe the exact punishment to be applied for all violations involving the unlawful dissemination of restricted atomic energy data.   And, in stating in Section 10 (b) (6) that the applicable provisions of other laws were not to be excluded, it meant to guard against possible omissions, rather than to give a prosecutor the option of proceeding under other laws against offenses fully covered by the Atomic Energy Act for the sole reason that under such other laws these offenses bore heavier penalties."   56 Yale L. J., at 797–798.

Finally, this specially qualified student of the Act concludes that the conflicts and inconsistencies which he laid bare regarding the

by the application for a stay which MR. JUSTICE DOUGLAS granted. More time was needed than was had for adequate consideration. Arguments by counsel are an indispensable adjunct of the judicial process, and responsible arguments require adequate opportunity for preparation. They must be pressed with the force of partisanship. And, because arguments are partisan, judgment further presupposes ample time and an unhurried mind for independent study and reflection by judges as a basis for discussion in conference. Without adequate study there cannot be adequate reflection; without adequate reflection there cannot be adequate discussion; without adequate discussion there cannot be the searching and fruitful interchange of informed minds which is indispensable to wise decision and which alone can produce compelling opinions. We have not had in this case carefully prepared argument. We have not had what cannot exist without that essential preliminary. We have not had the basis for reaching conclusions and for supporting them in opinions. Can it be said that there was time to go through the process by which cases are customarily decided here?

The crux of all I am suggesting is that none of the obvious considerations for bringing the all too leaden-footed proceedings in this case to an end should have barred the full employment of the deliberative process necessary for reaching a firm conclusion on the issue on which the Court has now spoken, however unfortunate it may be that that issue did not emerge earlier than it did. Since I find myself under the disability of having had

---

penalty provisions can only be resolved, as such conflicts and inconsistencies inevitably are resolved, by adjudication:

"*Differing penalty provisions:* The difference can only be resolved by judicial decision. Fortunately, this raises problems within judicial proceedings as such and does not pose any difficulties or dilemmas for the Commission in administering the Act." 56 Yale L. J., at 799.

insufficient time to explore the issue as I believe it should have been explored, nothing I am saying may be taken to intimate that I would now sustain the last claim made in behalf of the Rosenbergs. But I am clear that the claim had substance and that the opportunity for adequate exercise of the judicial judgment was wanting.

To be writing an opinion in a case affecting two lives after the curtain has been rung down upon them has the appearance of pathetic futility. But history also has its claims. This case is an incident in the long and unending effort to develop and enforce justice according to law. The progress in that struggle surely depends on searching analysis of the past, though the past cannot be recalled, as illumination for the future. Only by sturdy self-examination and self-criticism can the necessary habits for detached and wise judgment be established and fortified so as to become effective when the judicial process is again subjected to stress and strain.

American criminal procedure has its defects, though its essentials have behind them the vindication of long history. But all systems of law, however wise, are administered through men and therefore may occasionally disclose the frailties of men. Perfection may not be demanded of law, but the capacity to counteract inevitable, though rare, frailties is the mark of a civilized legal mechanism.

MR. JUSTICE DOUGLAS, dissenting.†

When the motion for a stay was before me, I was deeply troubled by the legal question tendered. After twelve hours of research and study I concluded, as my opinion* indicated, that the question was a substantial one, never

---

†[NOTE: This opinion was delivered June 19, 1953.]

*Attached hereto as an Appendix, *post*, p. 313.

presented to this Court and never decided by any court. So I issued the stay order.

Now I have had the benefit of an additional argument and additional study and reflection. Now I know that I am right on the law.

The Solicitor General says in oral argument that the Government would have been laughed out of court if the indictment in this case had been laid under the Atomic Energy Act of 1946. I agree. For a part of the crime alleged and proved antedated that Act. And obviously no criminal statute can have retroactive application. But the Solicitor General misses the legal point on which my stay order was based. It is this—whether or not the death penalty can be imposed *without the recommendation of the jury* for a crime involving the disclosure of atomic secrets where a part of that crime takes place after the effective date of the Atomic Energy Act.

The crime of the Rosenbergs was a conspiracy that started prior to the Atomic Energy Act and continued almost four years after the effective date of that Act. The overt acts *alleged* were acts which took place prior to the effective date of the new Act. But that is irrelevant for two reasons. *First,* acts in pursuance of the conspiracy were proved which took place *after* the new Act became the law. *Second,* under *Singer* v. *United States,* 323 U. S. 338, no overt acts were necessary; the crime was complete when the conspiracy was proved. And that conspiracy, as defined in the indictment itself, endured almost four years after the Atomic Energy Act became effective.

The crime therefore took place in substantial part *after* the new Act became effective, *after* Congress had written new penalties for conspiracies to disclose atomic secrets. One of the new requirements is that the death penalty for that kind of espionage can be imposed *only* if the jury recommends it. And here there was no such recommen-

dation. To be sure, this espionage included more than atomic secrets. But there can be no doubt that the death penalty was imposed because of the Rosenbergs' disclosure of atomic secrets. The trial judge, in sentencing the Rosenbergs to death, emphasized that the heinous character of their crime was trafficking in atomic secrets. He said:

> "I believe your conduct in putting into the hands of the Russians the A-bomb years before our best scientists predicted Russia would perfect the bomb has already caused, in my opinion, the Communist aggression in Korea, with the resultant casualties exceeding 50,000 and who knows but that millions more of innocent people may pay the price of your treason. Indeed, by your betrayal you undoubtedly have altered the course of history to the disadvantage of our country."

But the Congress in 1946 adopted new criminal sanctions for such crimes. Whether Congress was wise or unwise in doing so is no question for us. The cold truth is that the death sentence may not be imposed for what the Rosenbergs did unless the jury so recommends.

Some say, however, that since *a part* of the Rosenbergs' crime was committed under the old law, the penalties of the old law apply. But it is law too elemental for citation of authority that where two penal statutes may apply— one carrying death, the other imprisonment—the court has no choice but to impose the less harsh sentence.

A suggestion is made that the question comes too late, that since the Rosenbergs did not raise this question on appeal, they are barred from raising it now. But the question of an unlawful sentence is never barred. No man or woman should go to death under an unlawful sentence merely because his lawyer failed to raise the point. It is that function among others that the Great Writ

serves. I adhere to the views stated by Mr. Chief Justice Hughes for a unanimous Court in *Bowen* v. *Johnston,* 306 U. S. 19, 26–27:

> "It must never be forgotten that the writ of *habeas corpus* is the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired. *Ex parte Lange* [18 Wall. 163]. The rule requiring resort to appellate procedure when the trial court has determined its own jurisdiction of an offense is not a rule denying the power to issue a writ of *habeas corpus* when it appears that nevertheless the trial court was without jurisdiction. The rule is not one defining power but one which relates to the appropriate exercise of power."

Here the trial court was without jurisdiction to impose the death penalty, since the jury had not recommended it.

Before the present argument I knew only that the question was serious and substantial. Now I am sure of the answer. I know deep in my heart that I am right on the law. Knowing that, my duty is clear.

APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS.

Julius Rosenberg and Ethel Rosenberg, Petitioners,

*v.*

The United States of America.

} Application for a Stay.

June 17, 1953.

MR. JUSTICE DOUGLAS.

These are two applications for a stay of execution made to me after adjournment of the Court on June 15, 1953. The first raises questions concerning the fairness of the trial of the Rosenbergs. I have heard oral argument

on that motion and considered the papers that have been filed. This application does not present points substantially different from those which the Court has already considered in its several decisions to deny review of the case, to deny a stay of execution, and to deny a petition for a writ of *habeas corpus.* While I differed with the Court and thought the case should have been reviewed, the Court has spoken and I bow to its decision. Although I have the power to grant a stay, I could not do so responsibly on grounds the Court has already rejected.

Another motion for stay, together with a petition for writ of *habeas corpus,* challenges the power of the District Court to impose the death sentence on the Rosenbergs. The Espionage Act, § 2 (a), 40 Stat. 217, 218 (50 U. S. C. § 32 (a)) provides:

"Whoever, with intent or reason to believe that it is to be used to the injury of the United States or *to the advantage of a foreign nation,* communicates, delivers, or transmits, or attempts to, or aids or induces another to, communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by imprisonment for not more than twenty years: *Provided, That whoever shall violate the provisions of subsection (a) of this section in time of war shall be punished by death* or by imprisonment for not more than thirty years . . . ." (Italics added.)

Section 4 provides:

"If two or more persons conspire to violate the provisions of sections two or three of this title, and one or more of such persons does any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as in said sections provided in the case of the doing of the act the accomplishment of which is the object of such conspiracy. Except as above provided conspiracies to commit offenses under this title shall be punished as provided by section thirty-seven of the Act to codify, revise, and amend the penal laws of the United States approved March fourth, nineteen hundred and nine." 40 Stat. 219, 50 U. S. C. § 34.

The indictment, which was returned in 1951, charged a conspiracy to violate § 32 (a) with an intent to communicate information that would be used to the advantage of a foreign nation, *viz.,* Soviet Russia. The conspiracy was alleged to have continued from June 6, 1944 to and including June 16, 1950. The overt acts of the Rosenbergs which were *alleged* took place in 1944 and 1945.

On August 1, 1946, the Atomic Energy Act became effective. Sections 10 (b)(2) and (3) provide:

"(2) Whoever, lawfully or unlawfully, having possession of, access to, control over, or being entrusted with, any document, writing, sketch, photograph, plan, model, instrument, appliance, note or information involving or incorporating restricted data—[1]

---

[1] It would seem that the secrets involved in this case were "restricted data" within the meaning of the Act. Section 10 (b)(1) defines that term as meaning "all data concerning the manufacture or utilization of atomic weapons, the production of fissionable material, or the use of fissionable material in the production of power, but shall not

"(A) communicates, transmits, or discloses the same to any individual or person, or attempts or conspires to do any of the foregoing, with intent to injure the United States or with intent to secure an advantage to any foreign nation, upon conviction thereof, shall be punished by death or imprisonment for life *(but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury and only in cases where the offense was committed with intent to injure the United States)*; or by a fine of not more than $20,000 or imprisonment for not more than twenty years, or both;" (italics added).

"(B) communicates, transmits, or discloses the same to any individual or person, or attempts or conspires to do any of the foregoing, with reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation, shall, upon conviction, be punished by a fine of not more than $10,000 or imprisonment for not more than ten years, or both.

"(3) Whoever, with intent to injure the United States or with intent to secure an advantage to any foreign nation, acquires or attempts or conspires to acquire any document, writing, sketch, photograph, plan, model, instrument, appliance, note or information involving or incorporating restricted data shall, upon conviction thereof, be punished by death or imprisonment for life *(but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury and only in cases where the offense was committed with intent to injure the*

---

include any data which the Commission from time to time determines may be published without adversely affecting the common defense and security."

*United States*); or by a fine of not more than $20,000 or imprisonment for not more than twenty years, or both." (Italics added.) 60 Stat. 755, 766, 42 U. S. C. § 1810 (b)(2), (3).

It is apparent from the face of this new law that the District Court is without power to impose the death penalty except

*—upon recommendation of the jury*
*and*
*—where the offense was committed with an intent to injure the United States.*

Neither of those conditions is satisfied in this case, as the jury did not recommend the death penalty nor did the indictment charge that the offense was committed with an intent to injure the United States. If the Atomic Energy Act of 1946 is applicable to the prosecution of the Rosenbergs, the District Court unlawfully imposed the death sentence.

The Department of Justice maintains that the Espionage Act is applicable to the indictment because all of the overt acts *alleged* took place before the passage of the Atomic Energy Act of 1946. Petitioners maintain that since the indictment was returned subsequent to the Atomic Energy Act and since the conspiracy alleged, though starting prior to that time, continued thereafter, the lighter penalties of the new Act apply.

Curiously, this point has never been raised or presented to this Court in any of the earlier petitions or applications. The first reaction is that if it was not raised previously, it must have no substance to it. But on reflection I think it presents a considerable question. One purpose of the Atomic Energy Act was to ameliorate the penalties imposed for disclosing atomic secrets. As S. Rep. No. 1211, 79th Cong., 2d Sess., p. 23, stated, the problem in drafting § 10 was to protect the "common

defense and security" and yet assure "sufficient freedom of interchange between scientists to assure the Nation of continued scientific progress."

The Rosenbergs obviously were not engaged in an exchange of scientific information in the interests of science. But Congress lowered the level of penalties to protect all those who might be charged with the unlawful disclosure of atomic data. And if the Rosenbergs are the beneficiaries, it is merely the result of the application of the new law with an even hand. In any event, Congress prescribed the precise conditions under which the death penalty could be imposed. And all violators—Communists as well as non-Communists—are entitled to that protection.

This question is presented to me for the first time on the eve of the execution of the Rosenbergs without the benefit of briefs or any extended research. I cannot agree that it is a frivolous point or without substance. It may be that not every death penalty imposed for divulging atomic secrets need follow the procedure prescribed in § 10 of the Atomic Energy Act. If the crime was complete prior to the passage of that Act, possibly the old Espionage Act would apply. But this case is different in three respects: *First,* the offense charged was a conspiracy commencing before but continuing after the date of the new Act. *Second,* although the overt acts *alleged* were committed in 1944 and in 1945, the Government's case showed acts of the Rosenbergs in pursuance of the conspiracy long after the new Act became effective.[2]

---

[2] Thus the Government's brief filed July 25, 1952, in opposition to the petitions of the Rosenbergs and of Sobell for certiorari stated:

"In February 1950, when the arrest of Klaus Fuchs was publicized, Julius [Rosenberg] went to David [Greenglass] and told him that Fuchs' contact was the man who had got data from Ruth and David in June 1945; that Fuchs' arrest meant that the Greenglasses' activities would be discovered; and that therefore they would have to leave

*Third,* the overt acts of the co-conspirator, Sobell, were *alleged* to have taken place between January, 1946, and May, 1948. But the proof against Sobell, as against the Rosenbergs, extended well beyond the effective date of the new Act.[3] In short, a substantial portion of the case

the country (R. 523). These warnings were renewed at the time of the arrest of Harry Gold (R. 525–526, 709) in May 1950. During that month, Julius gave David $1,000, and promised him more, in order that David and Ruth might discharge their obligations and leave the country (R. 526, 710). In addition, he gave them specific and detailed instructions as to how to get to Mexico and ultimately to the Soviet Union (R. 526–530, 710).

"Julius informed the Greenglasses that he and his wife also were going to flee and that they would meet the Greenglasses in Mexico (R. 529, 713). Rosenberg did, in fact, ascertain from his physician what inoculations were needed for a trip to Mexico (R. 851), and he had passport pictures taken of himself and his family (R. 1427–1429).

"On May 30, 1950, in accordance with Julius' request, the Greenglasses had six sets of passport pictures taken, five of which they gave to Julius (R. 530–531, 712). The sixth set was retained by Greenglass and introduced in evidence at the trial (R. 531, 712; Ex. 9A, 9B). A week later, Julius visited the Greenglasses' apartment and gave David $4,000 wrapped in brown paper (R. 532, 713; Ex. 10). He asked David to repeat the flight instructions, which David did (R. 532–533). David gave the $4,000 to his brother-in-law, Louis Abel, who, after David's arrest, turned it over to the latter's lawyer (R. 536, 713, 794–795)."

[3] The Government's brief dated July 25, 1952, in opposition to the petitions for certiorari filed by the Rosenbergs and by Sobell summarized some of Sobell's activities as follows:

"In June 1948, [Max] Elitcher decided to leave the Bureau of Ordnance to take a job in New York (R. 256). When he informed Sobell of his plans, the latter urged him not to do anything until he discussed the matter with Rosenberg (R. 256).* Pursuant to arrangements made by Sobell, Elitcher met Rosenberg and Sobell in

"*Elitcher testified that Sobell said, 'Don't do anything before you see me. I want to talk to you about it, and Rosenberg also wants to speak to you about it' (R. 256)."

against the Rosenbergs related to acts in pursuance of the conspiracy which occurred after August 1, 1946.

I do not decide that the death penalty could have been imposed on the Rosenbergs only if the provisions of § 10

---

midtown New York (R. 256–257). When Rosenberg was told about Elitcher's plans, he tried to persuade Elitcher to remain in Washington, stating that he needed a source of information in the Navy Department (R. 257). Rosenberg further stated that he had already made plans for Elitcher to meet a contact in Washington (R. 257). During this conversation, Sobell also attempted to persuade Elitcher to stay at the Bureau of Ordnance; he told Elitcher, 'Well, Rosenberg is right, Julie is right; you should do that' (R. 257).†

"Sobell then left and Elitcher had dinner with Rosenberg (R. 257). During the course of dinner, Rosenberg said that money could be made available for the purpose of sending Elitcher to school to improve his technical status (R. 258). Elitcher asked Rosenberg how he had got 'started in this venture' (R. 258). Rosenberg replied that a long time ago he had decided that this was what he wanted to do; that he made it a point to get close to people in the Communist Party and kept getting from one person to another until he finally succeeded in approaching a Russian 'who would listen to his proposition concerning this matter of getting information to Russia' (R. 258).

"A month later, in July 1948, Elitcher drove with his family from Washington, D. C., to New York City, preparatory to changing his job (R. 259). On the way, he noticed that he was being followed (R. 259–260). Upon his arrival in New York, he proceeded to Sobell's home, where he planned to stay overnight (R. 259). When Elitcher told Sobell of his fear that he had been followed, Sobell became angry and said that Elitcher should not have come to his house; that he had some valuable information in the house that he should have given Rosenberg some time ago, information that was 'too valuable to be destroyed and yet too dangerous to keep around' (R. 260–261). Over Elitcher's protests, Sobell insisted the information be delivered to Rosenberg that night. Sobell then took a 35 millimeter film can from his house, and, accompanied by Elitcher, drove to Manhattan. While Elitcher waited in the car, Sobell left to deliver the can to Rosenberg. When Sobell returned, Elitcher

---

"†Elitcher, nonetheless, did not change his mind, and shortly afterwards changed his employment (R. 257, 255)."

of the Atomic Energy Act of 1946 were satisfied. I merely decide that the question is a substantial one which should be decided after full argument and deliberation.

It is important that the country be protected against the nefarious plans of spies who would destroy us.

It is also important that before we allow human lives to be snuffed out we be sure—emphatically sure—that we act within the law. If we are not sure, there will be lingering doubts to plague the conscience after the event.

I have serious doubts whether this death sentence may be imposed for this offense except and unless a jury recommends it. The Rosenbergs should have an opportunity to litigate that issue.

I will not issue the writ of *habeas corpus*. But I will grant a stay effective until the question of the applicability of the penal provisions of § 10 of the Atomic Energy Act to this case can be determined by the District Court and the Court of Appeals, after which the question of a further stay will be open to the Court of Appeals or to a member of this Court in the usual order.

*So ordered.*

---

asked him what Rosenberg thought about his being followed (R. 261). Sobell replied that Rosenberg said that he had 'once talked to Elizabeth Bentley on the phone but he was pretty sure she didn't know who he was and therefore everything was all right' (R. 261). The two then returned to Sobell's house (R. 261)."