No. 524. CHEMICAL BANK & TRUST CO., TRUSTEE, *v.* GROUP OF INSTITUTIONAL INVESTORS;

No. 525. ALLEGHANY CORPORATION *v.* GROUP OF INSTITUTIONAL INVESTORS;

No. 526. MISSOURI PACIFIC RAILROAD COMPANY 5¼% SECURED SERIAL BONDHOLDERS COMMITTEE *v.* GROUP OF INSTITUTIONAL INVESTORS;

No. 527. FARWELL ET AL. *v.* GROUP OF INSTITUTIONAL INVESTORS; and

No. 528. MISSOURI PACIFIC RAILROAD CO. *v.* GROUP OF INSTITUTIONAL INVESTORS.

Memorandum of MR. JUSTICE FRANKFURTER, in connection with the denial of the petitions for writs of certiorari█

Reference to the opinion in *Maryland* v. *Baltimore Radio Show,* 338 U. S. 912, makes it unnecessary to indicate the reasons which preclude the Court from stating, however briefly, the grounds for denial of petitions for certiorari. Selective notations of dissent from such denials would not correctly reflect the operation of the certiorari process. That would require notation not only of all dissents when petitions are denied. It would equally require public recording of dissents from the granting of petitions. Due regard for all these factors touching the administration of our certiorari jurisdiction has determined my unbroken practice not to note dissent from the Court's disposition of petitions for certiorari.

But it has seemed to me appropriate to indicate from time to time the issues that are involved in a litigation for which review has been sought and denied. These cases, arising out of the long-drawn-out Missouri Pacific reorganization, present another such instance. The

[black bar]

denial of these petitions for certiorari does not definitively close the door for relief to security holders who claim forfeiture of their rights. The current Interstate Commerce Commission plan for the reorganization of the Missouri Pacific system has not been consummated. It may never be consummated. If carried to the stage of confirmation by the lower courts, review may again be sought here, perhaps with the benefit of additional light. But as the matter stands, two great questions are in controversy; they are questions for which the Congress has not authorized the Interstate Commerce Commission to give final answers.

The reorganization plan sustained by the lower court involves the forfeiture of existing securities of vast proportions. The Commission's plan also eliminates existing corporations and directs financial power into new channels. These far-reaching consequences are based on the Commission's predictions of the future. One is not remotely unmindful of the relevant elements and their meaning on which judgment in such matters must be based, nor of the diffidence with which courts should sit in judgment upon the Commission's conclusions, by reminding that the Reorganization Act of 1933 (§ 77 of the Bankruptcy Act), 47 Stat. 1467, 1474, as amended, did subject to judicial review the determinations of the Commission and the processes which underlie them.

In three years (1940, 1944, and 1949) the Commission has proposed forfeiture plans on the basis of estimates of future earnings of the three component parts of the Missouri Pacific lines. The estimates on which the Commission based its proposals to strike down hundreds of millions of dollars of securities were the same in 1944 as in 1940. In 1949, the Commission recognized that the 1940 and 1944 estimates and forfeiture proposals were unsound, to the extent of millions of dollars.

In the eleven years since the Commission first proposed forfeiture on the basis of estimates of future earnings in this case, the actual earnings of each of the three component parts of the Missouri Pacific lines have exceeded those estimates. Two of the three have earned, in those eleven years, more than twice as much as the estimates; one earned almost fifty percent more than the estimate.

For the system as a whole, the actual earnings of the eleven post-estimate years averaged $18,000,000 per year more than the estimate on which the Commission's forfeiture plan was based. For every million dollars of underestimate of future earnings the Commission's forfeiture proposals would unjustly destroy twenty to twenty-five million dollars of securities. (For the basis of this calculation see my opinion in *Bondholders, Inc.* v. *Powell,* 342 U. S. 921.) The error indicated by the eleven years of actual earnings suggests that the Commission undervalued the property in 1940 and 1944 by $360,-000,000 to $450,000,000.

In 1949, when the Commission adopted higher estimates for each of the three components of the Missouri Pacific lines and for the system as a whole, the Commission doubled the 1940 and 1944 estimates of the future earnings of one of the three parts of the Missouri Pacific system. But the actual earnings of each of the three years since the 1949 estimate substantially exceeded even that doubled estimate. Similarly, though the Commission in 1949 substantially increased the 1940 and 1944 estimates for the other two components of the system, their actual earnings for the three ensuing years were, in the case of one of these two sections of the system, double the Commission's 1949 estimate, and, in the other, 48 percent above the 1949 estimate.

On the basis of the record of actual earnings so far available, the indicated error in the Commission's 1949

increased estimates of future annual earnings is $11,-500,000; this sum, multiplied twenty to twenty-five times, in accordance with the Commission's procedures in determining the amount of forfeitures in railroad reorganizations, implies a wiping out, under the 1949 plan, of $230,000,000 to $287,500,000 of junior security holder interests.

Besides the rights which the Commission has thrice deemed valueless, it has proposed to substitute securities less valuable than what bondholders at present own. The total stated amount of Missouri Pacific system bonds, stocks, and accumulated, unpaid interest and preferred dividends, whose owners would suffer what amounts to partial or entire forfeiture, exceeds three quarters of a billion dollars.

Of these, the Missouri Pacific preferred and common stock, the two junior securities owned by the public, may be considered in connection with the estimates on which the Commission in its 1949 plan proposes to forfeit one in large part and the other entirely. The present preferred stock has a par value of $100 per share; in addition, as the Commission and the lower courts have noted, accumulated dividends (now approximately $150 per share) must be taken into account. As to each share, having this aggregate lawful claim of $250 of participation in the railroad's property, the Commission's plan would wipe out as valueless some $207, and allow $43 as of some value. At the present dividend rate, the Commission's finding in effect assumes that the Missouri Pacific system can earn on its present preferred stock not more than $2.15 per share. The actual earnings on this stock, in the eleven years since the Commission first began to issue its plans for the Missouri Pacific, have been $17 per share per year, or eight times the increased estimate made by the Commission in 1949. In the three

years since the Commission ruled that the present preferred stock has a value of only $43 per share the company has earned more than $43 on each share.

As to the Missouri Pacific common stock: in 1940, 1944, and 1949 the Commission ruled that this stock is without value—*i. e.*, that the railroad system will in the years subsequent to the making of the estimates be unable to earn one cent on its common stock. The actual earnings on each share of this stock, in the eleven years since the Commission first declared it valueless, have averaged $10 a year.

It might be expected that when the Commission has, at three different periods, made estimates of future earnings for each of three component portions of a railroad system, as well as for the system as a whole, and in effect for various classes of its securities, some of the errors inevitable in each of the numerous estimates would be overestimates and some would be underestimates. In this Missouri Pacific proceeding, the Commission's errors have invariably been underestimates—for the system as a whole, for each part of the system, for different classes of securities, in 1940, again in 1944, and once again in 1949.

This picture is of course drawn with a broad brush. Many other factors would enter into the whole fiscal story of estimated earnings, actual earnings, miscalculations, foreseeable factors left out of account, unforeseeable factors, etc., etc. They would not affect the essentials here indicated—the uniformity of erroneous guessing, the invalid assumptions of such guessing, the tenuous nature of the process whereby vast interests were adversely affected, the inadequate basis for exercising the judicial scrutiny demanded by Act of Congress, etc., etc., etc. Even more than did the Seaboard situation the whole record in the Missouri Pacific reorganization proves "not the mischance of a mere guess. It calls into ques-

tion the whole process of dealing with this problem.
. . . the records of these railroad reorganizations at the
hands of the Interstate Commerce Commission and spe-
cial masters and courts have inevitably aroused deep
scepticism as to expertise in this field, or, at least, as to
reliance in decreeing drastic forfeitures on the basis of it.
It is not to be wondered that both the Executive and the
Congress have recorded dissatisfaction with the heavy
incidence of forfeiture decreed by courts, not by virtue
of specific authorization but as a matter of judicial
administration." [*Bondholders, Inc.* v. *Powell,* 342 U. S.
921, 926.]