129 F.Supp. 392 (1955)
In the Matter of MISSOURI PACIFIC RAILROAD COMPANY, Debtor.
No. 6935.
United States District Court E. D. Missouri, E. D.
February 25, 1955.
*393 *394 Russell L. Dearmont and Thomas T. Railey, St. Louis, Mo., for Guy A. Thompson, Trustee, Missouri Pac. R. Co. and all other debtor companies.
Burton K. Wheeler and Edward K. Wheeler, Washington, D. C., and Oliver & Oliver, Cape Girardeau, Mo. (Wheeler & Wheeler, Washington, D. C., of counsel), for Missouri Pac. R. Co., debtor.
John L. J. Hart, John Fleming Kelly, and Jay W. Tracey, Jr., Denver, Colo. (Holland & Hart, Denver, Colo., of counsel), for Alleghany Corp.
Percival E. Jackson, New York City (Theodore N. Tarlau and Joseph J. Bryer, New York City, of counsel), for Group of Holders of First and Refunding Mortgage Bonds of Missouri Pac. R. Co.
DeLancey C. Smith, San Francisco, Cal., Henry I. Stimson, New York City (Tralles, Hoffmeister & Gilpin, St. Louis, Mo., and Hale, Stimson, Russell & Nickerson, New York City, of counsel), for Protective Committee of 5¼% Secured Serial Gold Bonds of Missouri Pac. R. Co. and certain stockholders of N. O. T. & M. R. Co.
Harry Kirshbaum, New York City, for Missouri Pac. Convertible Bondholders Group.
Robert E. Smith, New York City, for Protective Committee for Holders of Preferred Stock of Missouri Pac. R. Co.
Abraham K. Weber, New York City, for Carl Rosenberger et al., holders of International-Great Northern R. R. Adjustment Mortgage Bonds.
Charles W. McConaughy, New York City, and Jacob Chasnoff, St. Louis, Mo. (Cadwalader, Wickersham & Taft, New York City, and Lowenhaupt, Mattingly, Chasnoff & Stolar, St. Louis, Mo., of counsel), for Group of Institutional Investors Holding First and Refunding Mortgage 5% Bonds of Missouri Pac. R. Co.
W. Hugh Peal and Allan Kuller, New York City, Chadbourne, Parke, Whiteside, Wolff & Brophy, New York City, for *395 Manufacturers Trust Co., Trustee, Missouri Pac. R. R. First and Refunding Mortgage.
James I. Wyer, New York City, Ballantine, Bushby, Palmer & Wood, New York City, for Bankers Trust Co., Trustee, Missouri Pac. 5½% Convertible Bonds.
Emmet McCaffery, New York City, Dorr & Hand, New York City, for Chemical Corn Exchange Bank, Trustee under Indenture Securing Missouri Pac. 5¼% Secured Serial Bonds.
Hugh L. M. Cole, New York City, Milbank, Tweed, Hope & Hadley, New York City, and Wm. G. Pettus, Jr., St. Louis, Mo., Shepley, Kroeger, Fisse & Shepley, St. Louis, Mo., for City Bank Farmers Trust Co., Trustee under International-Great Northern First Mortgage.
Moses & Singer, New York City (Felix Fishman and Lyonel E. Zunz, New York City, of counsel), for Oscar Gruss & Son, as Holders of International-Great Northern R. R. Adjustment Mortgage Bonds.
Edward F. Colladay, Colladay & Colladay, Washington, D. C., and Everett Paul Griffin, St. Louis, Mo., for Protective Committee of First Mortgage Bonds of International-Great Northern R. Co.
William H. Biggs, St. Louis, Mo., for Missouri Pac. 5¼% Secured Serial Gold Bonds Committee.
Frederick M. Myers, Jr., and L. George Reder, Pittsfield, Mass., on behalf of Independent Directors, Missouri Pac. R. Co.
S. Mayner Wallace, St. Louis, Mo., Leonard D. Adkins, New York City, for Savings Banks Trust Co., Holder of N. O. T. & M. First Mortgage Bonds.
Wm. C. Connett IV, St. Louis, Mo., Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for St. Louis Union Trust Co., Trustee, and Roland C. Behrens et al., as a Bondholders Protective Committee for Little Rock & Hot Springs Western Bonds.
Smith, Harris & Hanke, St. Louis, Mo., and Milton Paulson, New York City (Samuel M. Koenigsberg, Newark, N. J., of counsel), for Estate of Adelaide Loria, Deceased, Owner of $5,000 principal amount of Missouri Pac. R. R. General Mortgage Bonds.
James J. Lewis, Alfred B. Teton, Grant G. Guthrie, Chicago, Ill. (Froelich, Grossman, Teton & Tabin, Chicago, Ill., of counsel), for Protective Committee for Holders of Common Stock of Missouri Pac. R. R. Co.
Jones, Hocker, Gladney & Grand and George S. Roudebush, St. Louis, Mo. (Hopkins, Sutter, Halls, Owen & Mulroy, and Harry B. Sutter, C. Ives Waldo, Jr. and James J. McClure, Jr., Chicago, Ill., of counsel), for Avery Brundage et al., Stockholders of N. O. T. & M. R. Co.
Walter H. Brown, Jr., New York City (Willkie, Owen, Farr, Gallagher & Walton, New York City, of counsel), for New York Trust Co.
MOORE, Chief Judge.
These are proceedings under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, for the reorganization of the three principal debtors, Missouri Pacific Railroad Company, New Orleans, Texas & Mexico Railway Company, and the International-Great Northern Railroad Company, and their subsidiary debtors. The matter before the Court is a plan of reorganization for the aforesaid companies, which plan, herein called the 1954 Plan, is the fourth Plan of Reorganization submitted to this Court by the Interstate Commerce Commission. Previous plans were submitted in 1940, 1944 and 1949, with respect to which previous opinions of this Court may be found under the style of In re Missouri Pacific Railroad Co., 39 F.Supp. 436; Id., 50 F. Supp. 936; Id., 64 F.Supp. 64, and Id., 93 F.Supp. 832.
The 1949 Plan, though approved by this Court and affirmed by the Court of Appeals for the Eighth Circuit, sub nom. State of Texas v. Group of Institutional Investors, 191 F.2d 265, certiorari denied 342 U.S. 904, 72 S.Ct. 293, 96 L.Ed. 676; Morris v. Group of Institutional Investors, 342 U.S. 918, 72 S.Ct. 364, 96 L.Ed. *396 686; Chemical Bank & Trust Co. v. Group of Institutional Investors, 343 U.S. 929, 72 S.Ct. 757, 96 L.Ed. 1339, and Chemical Bank & Trust Co. v. Group of Institutional Investors, 343 U.S. 982, 72 S.Ct. 1018, 96 L.Ed. 1372, was returned to the Commission prior to final confirmation pursuant to a petition under Section 208, Title 11 U.S.C.A., eighteen months having expired since the Commission filed its plan with the Court. The Commission reopened its proceedings upon concluding that "changed conditions are such as to constitute developments which have occurred since approval of the 1949 Plan of Reorganization which make it necessary that the Commission re-examine and reconsider such Plan pursuant to the provisions of Section 208(b) of Title 11, U.S.Code, and, if necessary, to modify such Plan."
Accordingly, the Commission held hearings, and in February, 1954, an Examiners' Proposed Report was issued recommending substantial modifications and changes in the 1949 Plan of Reorganization.
Meanwhile, the Trustee of all Debtor Companies, Guy A. Thompson, pursuant to an order of this Court on the Trustee's motion, offered his services and cooperated with the parties to these proceedings in an effort to aid them in composing their differences with respect to a plan of reorganization, so that a final reorganization of the debtor companies might be expedited. As a result of extended negotiations, stipulations were signed by a large majority of the parties in interest approving what was called an "Agreed System Plan". This plan modified in certain respects the plan approved by the Examiners; and the Plan approved by the Commission and certified to the Court substantially adopted the modifications of the 1949 Plan proposed by the Examiners as modified in the "Agreed System Plan".
The details of the 1954 Plan of Reorganization need not be set out here in detail. The Plan appears in Volume LXIV of the Missouri Pacific Reorganization Proceedings. The distribution of cash and new securities under the plan is in accordance with the Commission's Appendix "J", which is attached at the end of this opinion.
Objections and claims for equitable treatment were filed prior to the hearing for approval of the Plan by eight groups. One group, Stewart Huston et al., so-called "Independent Directors of Missouri Pacific", was permitted to participate in the hearing subject to objections that they have no authority to represent the Debtor, its Board of Directors, or any defined or determinable group of creditors, stockholders or others having a right to be heard. Those objections are now sustained, see Huston v. Thompson, 8 Cir., 1954, 217 F.2d 308, and the objections of the so-called Independent Directors will not be further considered.
Objections of St. Louis Union Trust Company, Trustee under the Little Rock & Hot Springs Western First Mortgage Bonds will not be herein considered because the claim of these bondholders has been separately determined in a manner which dispenses with the objections.
The remaining objections are primarily directed to two propositions: (1) that the treatment accorded certain claims are unfair and inequitable, and that the Commission failed to apply applicable legal standards; and (2) that the Commission lacked power to approve and certify to the Court a plan providing for the merger of the debtor companies under the facts in this case.
It is worthy of note at this point that as to all the objecting parties, there are other parties representing the same securities, or interests, which have appeared in this Court strongly advocating the prompt approval of the Plan. In contrast with hearings on earlier plans submitted to this Court, no oral testimony was offered in support of objections, and only two documents were offered which the Court believes are immaterial.
This is not to say that the objections are considered frivolous or insincere, but merely to point out that the record is substantially without conflict and the objectors *397 are relying primarily on legal argument to sustain their position.
The group of Institutional Investors Holding First and Refunding Mortgage 5% Bonds of Missouri Pacific Railroad Company has filed Objections and Brief in support thereof, urging that the Plan is unfair to those bondholders, that the Plan is unsound, and that the Commission failed in the performance of its duties in accepting and approving the "Agreed System Plan".
This Group represents approximately $21,000,000 principal amount of these bonds, or about 10% of the total of all the First and Refundings, the senior creditors of the principal debtor. The Group of Institutional Investors has been in these proceedings from almost the inception, and has rendered valuable service to this Court through these many years. The Group of Investment Companies who joined with the Institutional Group in the past have now, however, filed no objections to the plan; and a new Group of Owners and Holders of these bonds, representing some $6,000,000 principal amount, have appeared and urged the approval of the Plan.
The Plan provides that the First and Refunding Bonds are to receive payment of interest in full up to the effective date of the Plan, which is January 1, 1955, and the full face amount of their bonds in new Series B & C First Mortgage Bonds of the reorganized Company, with interest at the rate of 4¼%.
At the time of hearing on the Plan the interest payments on the First and Refunding Bonds were made, bringing these bonds up to a current status. They are to receive a full pay-out, which has not occurred in any prior reorganization under Section 77.
The gist of the objections of the Institutional Group seems to be that where the Common Stock of the debtor is receiving recognition the "absolute priority" rule requires that the senior creditor must receive new securities which can be converted into an equal amount of cash at or shortly after receipt, and the interest rate cannot be less favorable than under the old bonds. They argue that the Plan is unsound in that it sets up a capitalization which is overladen with debt securities in an attempt to provide some room for the Common Stock equity, with provisions which are sure to cause trouble, all at the expense of the First and Refundings; and that the Commission has, in effect, abdicated its function in approving the "Agreed System Plan".
The Commission found that the new First Mortgage Bonds, Series B and C, are the equitable equivalent of the First and Refundings, and are at least equal to, if not better than, the First and Refundings; and that the new bonds will have a cash value equal to the face amount thereof.
Under Section 77 there is no continuing right to interest at the contract rate. As in other bankruptcy proceedings, the obligations of the debtor are matured upon filing, and the rights of the respective interests are measured as in liquidation. The senior claims have the right to preservation of their priority. "That is to say, senior claims first receive securities of a worth sufficient to cover their face and interest before junior claims receive anything". Ecker v. Western Pacific, 318 U.S. 448, at page 483, 63 S.Ct. 692, 712, 87 L.Ed. 892. But this does not mean that all provisions of the senior security remain in force and effect, or that settlement be made in cash. The rule is that in the order of their priority the security holders receive the "equitable equivalent" of the rights surrendered. Group of Institutional Investors v. Chicago, Milwaukee, St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 749, 87 L.Ed. 959. "Equitable equivalent" does not mean "cash equivalent", as the argument of the Group here would suggest. "A requirement that dollar values be placed on what each security holder surrenders and on what he receives would create an illusion of certainty where none exists and would place an impracticable burden on the whole reorganization process." Milwaukee *398 case, supra. There is nothing in Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982, heavily relied on by the Group, to indicate that a reduced interest rate alone must be the basis of comparing the old with the new securities. The Commission has found on abundant evidence that the 4¼% rate provides the new First Mortgage Bonds with an equitable equivalent to the old First and Refunding Bonds.
In this connection, the Trustee produced at the hearing an acknowledged expert rail security analyst, Pierre Bretey, who testified without opposition that the new 4¼% Series B and C First Mortgage Bonds "are going to be a very strong institutional obligation", and that in his opinion they will sell at par or better at the time of consummation of the Plan  probably at their call price of 102.
The effect of the Group's argument that they should retain the 5% rate would be that the new bonds would sell at considerably higher than par.
The requirement of equitable equivalence has been met in this case. The determination of the question requires a consideration of all the bundle of rights belonging to a security under all the facts and circumstances in the case. The loss in interest rate of these bonds is compensated by the addition of a strong Sinking Fund which the old First and Refunding Bonds did not have, and by the substitution of a system mortgage for a divisional mortgage.
As to the amount and character of the capitalization of the Reorganized Company, the function of this Court is a very limited one. In the Milwaukee case, supra, the Supreme Court stated: "The ratio of debt to stock, the amount of fixed as distinguished from contingent interest, the kind of capital structure which a particular company needs to survive the vicissitudes of the business cycle  all these have been reserved by Congress for the expert judgment and opinion of the Commission which the courts must respect."
And in the Western Pacific case, supra, the Court said, 318 U.S. loc. cit. 473, 474, 63 S.Ct. loc. cit. 707: "Another restriction on court action is that the determination as to whether the plan is `compatible with the public interest' rests, as valuation does, with the Commission. Subsection (d). Without attempting to forecast the limits of the phrase as used in the setting of this statute, it is sufficient in this case to determine, as we do, that it includes the amount and character of the capitalization of the reorganized corporation. * * *
"The development of the capitalization of the reorganized company which is entrusted solely to the Commission under the requirement that the plan be compatible with the public interest is that relating to the total amount of issuable securities and the quality of the securities to be issued. So long as legal standards are followed, the judgment of the Commission on such capitalization is final."
The record before the Commission and the 7th and 8th Supplemental Reports of the Commission show the painstaking care with which the Commission approached the problem of capitalization. The record abundantly supports the Commission's view of the earnings potential and other relevant factors which formed the basis of the capitalization of the new company. There was material evidence to support its conclusions. The Commission points out that the fixed interest charges are covered 3.8 times and the total of fixed and contingent interest charges is covered 2.2 times by the average earnings for the period 1949-1953. (R. 35086-7.)
The Trustee further offered the testimony of his Chief Executive Officer Neff and Chief Financial and Accounting Officer Peet that, in their opinions, the capitalization was feasible and would work out satisfactorily in normal times with benefits to all parties. This testimony went virtually unchallenged.
*399 It is to be noted that the maximum capitalization figure of approximately 810 million dollars was the figure proposed by the Examiners in February, 1954, and that the "Agreed System Plan" worked within this framework. The Commission carefully reviewed the evidence before it in its 7th Supplemental Report, and there is no question in the Court's mind that it followed legal standards in exercising its judgment. To allege that the Commission "abdicated" its duties by adoption of the "Agreed System Plan" is to fly in the face of the record in this case.
This attempt to condemn the Commission's Plan because it represents to an extent an earnest effort of most of the parties to the proceeding to compose their differences can be disposed of by what this Court said in an earlier opinion in these proceedings, 64 F.Supp. at page 74: "This court does not believe that the * * * recognition of a compromise plan presented by important parties in interest is any evidence at all of a failure of the Commission to perform its function. In view of the extremely complicated and contentious nature of a railroad reorganization proceeding, and its tendency to drag on over the years, compromise plans are to be favored rather than criticized, when they tend to expedite reorganizations and allow greater participation by those not so securely situated." This statement is even more applicable today than it was in 1945.
Much of what has been said above with regard to valuation, capitalization and allocation applies to the objections of other parties as to unfair and inequitable treatment. A group of holders of the common stock of NOTM objects that the Commission has erred in not only undervaluing their stock at $250 per share, but in allocating them securities of a face value of only $216 a share. Without going into detail, the Court believes that the findings of the Commission on this score are amply supported by the record, and that the Commission did not fail to follow the applicable legal standards. The Commission concluded that holders of the NOTM common stock were fully compensated by the allocation of all debt securities rather than some debt and some equity securities, which had been proposed in the Examiner's Report. Furthermore, in the hearing before this Court, Witness Bretey testified that in his opinion the NOTM common stockholders were receiving handsome treatment under the plan because on a comparative basis their new securities are selling in excess of the market value of Texas & Pacific Railway Common Stock; that the stock of Texas & Pacific selling at about $150 per share is a much better and sounder investment than would be the common stock of NOTM as a separate company. This testimony was virtually unchallenged. Under these circumstances, the Court is of the opinion that the NOTM stockholders will receive the equitable equivalent of their old securities, and that there has been no unjust discrimination. For the first time in these proceedings, this stock is given equal treatment with the Missouri Pacific Secured 5¼'s, which are secured by NOTM stock owned by the parent company.
Most of the objectors place heavy reliance on the alleged illegality of the proposed merger of the debtor companies in the Plan. They argue that the Commission has no power to "force" a merger under the holding of the Supreme Court in St. Joe Paper Co. v. Atlantic Coast Line R. Co., 347 U.S. 298, 74 S.Ct. 574, 576, 98 L.Ed. 710. Consideration of this objection requires some details of the history of the debtors and these proceedings.
When the original voluntary petitions of the three principal debtors were filed in this court in 1933, those railroad companies had for some years been closely affiliated. Missouri Pacific owned about 94% of the stock of NOTM, and that company owned substantially all the stock of the International. The petitions of the NOTM and International, and other subsidiary debtors, prayed that they "be allowed to effect a plan of reorganization *400 in connection with, or as a part of, the plan of reorganization of Missouri Pacific". The first plan of reorganization filed by the three principal debtors with this Court and the Commission in 1935 and 1936, respectively, provided for a system reorganization through consolidation of these companies and practically all their subsidiary railroads. All of the plans approved by the Commission have provided for merger or consolidation of most of the subsidiary debtors with the Missouri Pacific.
The Commission found with respect to the 1949 Plan that the system reorganization would result in economies of operation, would be in the public interest, and to the advantage of all the debtors. 275 I.C.C. 59, 103. Those findings were approved by this Court and by the Court of Appeals. The Commission in its 7th Supplemental Report finds that the evidence does not justify a reversal of their previous conclusions as to the desirability of a System reorganization, and no modifications of the 1949 Plan were made in those respects.
Furthermore, the testimony of Mr. Neff, Mr. Peet and Mr. Bretey at the hearing before this Court, emphasized the importance of the system reorganization. Mr. Neff testified that separate reorganizations would impair the morale of employees, would destroy the advantages of the combined sales organization of the debtors under the Trustee's operation, to which the public and shippers had become well educated, and which had placed the system in a strong competitive position with other roads in attracting the business of new industries. He called attention to the large additional expense which would be incurred by the debtors in separate reorganizations because of duplication of many officers and some physical equipment. His testimony was corroborated in many details by Mr. Peet, and his further conclusion that the NOTM would be severely weakened by a separate reorganization was concurred in by Mr. Bretey.
Now the position of the objectors is that the Commission lacks power to approve and certify to this Court a plan of reorganization whereby a debtor railroad would be "compelled" to merge with another debtor railroad without first obtaining a favorable vote of the stockholders. This, they contend, follows from the decision of the Supreme Court in the St. Joe case, supra. In that case, Mr. Justice Frankfurter, speaking for the majority of the Court, opens the opinion with this sentence:
"The sole question for decision in this case is whether the Interstate Commerce Commission has the power under § 77 of the Bankruptcy Act to submit a plan of reorganization to a district court whereby a debtor railroad would be compelled to merge with another railroad having no prior connection with the debtor."
After tracing the factual situation and reviewing the legislative history of Section 77 and Section 5 of the Interstate Commerce Act, 49 U.S.C.A. § 5, the opinion states 347 U.S. loc. cit. 306, 74 S.Ct. loc. cit. 579:
"We therefore conclude that the Commission does not have under § 77 of the Bankruptcy Act a power which Congress has repeatedly denied it under the Interstate Commerce Act, namely to initiate the merger or consolidation of two railroads."
Then in 347 U.S. at page 309, 74 S.Ct. at page 580:
"All this of course is not to say that mergers cannot be carried out in the course of a § 77 reorganization. It merely means that if they are, they must be consummated in accordance with all the requirements and restrictions applicable to mergers under the Act primarily concerned with railroad amalgamations, the Interstate Commerce Act. So far as here relevant, that means that the merger must be worked out and put before the Commission by the merging carriers.12 It also means that one carrier cannot be railroaded *401 into an undesired merger with another carrier."
Footnote 12 reads, in part, as follows:
"12. We are not aware of any case other than the present where this requirement was not observed. In all the reported cases of reorganizations involving mergers, the merger was either proposed by the debtor in conjunction with the other party, or the merger involved a parent and its subsidiaries, and was treated essentially as an internal reorganization. In any event we are not now called upon to pass on the validity of the latter type of merger.
"* * * Thus it follows from the consistency clause, when viewed in the light of this corporate continuity of a railroad in reorganization, that those who in the absence of § 77 would wield the corporate merger powers must initiate and work out the merger now. * * *"
The Court then goes on to rule that such a power in the Commission cannot be derived from the so-called "cram down" powers of the District Court under Section 77(e).
The facts of the St. Joe case are vastly different from the Missouri Pacific case. The debtor in reorganization was the Florida East Coast Railway Company, and the plan of reorganization contemplated the merger or consolidation with the Atlantic Coast Line Railroad Company, a road not in reorganization, and one which had no prior relation to the debtor other than as general creditor and as a connecting carrier. The reorganization proceeding succeeded an equity receivership, both of which were initiated at the instance of creditors. The Debtor, Florida East Coast, had been declared by the Commission to be hopelessly insolvent, the value of the assets being substantially less than the total amount of the bonds. The debtor corporation had not filed any plan of reorganization and, in fact, had been relieved of its duty to do so by an order of the district court. The Plan which reached the Supreme Court was one of a series which had their genesis, so far as the merger provisions were concerned, in a plan submitted by a bondholder and subsequently espoused by the Atlantic Coast Line and modified several times by the Commission.
Despite the vast differences in the factual situation in the Missouri Pacific case and the express reservation of the Supreme Court as to the merger of a parent and its subsidiaries, the objectors urge that the St. Joe case is binding on this Court in these circumstances because, they allege, the provisions of Section 5(11) of the Interstate Commerce Act requiring the assent of shareholders at a meeting of the stockholders has not been complied with in the case of any of the debtors, and the plan has, therefore, been "forced" on them by the Commission. This argument ignores the express reservations of the Supreme Court as to its limited jurisdiction in the first sentence of the opinion, and as to mergers of parents and subsidiaries which are treated essentially as internal reorganizations. In the opinion of this Court the rationale of the St. Joe case is not applicable in the circumstances of this case. Note the reference by the Court in Note 8 to the proviso suggested in 1939, but not adopted, as to which a qualified witness "* * * questioned the need for the proviso on the ground that the consistency clause in sub-section (f) already covered the matter and that the proviso might be construed to prevent merger of a parent and its subsidiaries."
However, the Commission concludes in its report that though it believed the St. Joe case to be inapplicable, that it had complied with all the requirements of Section 5 of the Interstate Commerce Act, and that the railroads concerned and their stockholders had already advanced proposals for mergers.
The objectors make much of the fact that the New Orleans common stock is pledged under the Missouri Pacific Secured Serial Bonds and that, *402 therefore, the Missouri Pacific is in no position to vote said stock, nor is the Trustee. However, even if the requirements of Section 5 must be complied with in this case, I am of the opinion that under all the circumstances, as related above, they have been complied with insofar as possible in this case. This does not mean that I conclude that the stockholder assent has taken place. A construction of Sec. 5(11) that the stockholder assent must occur before submission of a plan to the Commission leads to the very undesirable result that stockholders' meetings must be held every time a modification occurs before the Commission. Furthermore, the language of the Supreme Court that "those who in the absence of § 77 would wield the corporate merger powers must initiate * * *" is broad enough to include the Directors, who under the laws of Missouri and Louisiana (the States of incorporation of Missouri Pacific and NOTM respectively) are the source of merger proposals which the stockholders only approve or disapprove at a regular or special meeting. Vernon's Ann.Mo. Statutes, §§ 351.410 and 351.415; LSA-R.S. Title 12, Sec. 48. There are, apparently, no provisions of either the State law nor the Interstate Commerce Act, or the Bankruptcy Act, that set a time for shareholder approval, or require that it be done before the Commission and the District Court have approved of the plan. In fact, the provisions of Section 77 requiring the plan to be submitted to the various classes of claimants after approval support the view that the shareholders should not yet have had the plan submitted to them for approval. I do not find that this is inconsistent with the provisions of subsection (11) of Section 5. See Concurring Opinion of Holmes, J., in Atlantic Coast Line Railroad Co. v. St. Joe Paper Co., 5 Cir., 216 F.2d 832, at page 837.
I conclude that the Commission had the power to submit to the Court for approval the plan involving a merger of the debtors.
On consideration of the record and the evidence, the Court is of the opinion that all objections should be overruled, and that all claims for equitable treatment should be denied. Due regard has been given to the requirement that the Commission approve a plan which will be compatible with the public interest. The Court is satisfied that the Plan complies with the provisions of subsection b, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and that the Plan conforms to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders.
Section T of the Plan provides that the expenses of reorganization shall be paid in cash as a cost of administration prior in lien to the new securities issued under the Plan. Applications for allowances, and affidavits in support thereof, have heretofore been filed with the Court and forwarded to the Commission, and hearings have been set before the Commission on the expenses and fees incident to the reorganization. The Court finds that the Plan conforms to the requirements of Section 77, sub. e(2) and (3).
The Commission's findings of "no value" for the unsecured creditors and stockholders of the International are hereby affirmed.
The Plan will be approved and Order overruling all objections, denying all claims for equitable treatment, and approving the Plan may be submitted. *403 APPENDIX J.

 MISSOURI PACIFIC SYSTEM
 Modified Plan of Reorganization Approved by the Interstate Commerce Commission Effective Date January 1, 1955
 Distribution of Cash and Securities Including Equipment Obligations as of 12-31-1952
 No Par Common Stock
 ____First Mortgage 4¼% Bonds____ General Mortgage ____at $100 Per Share____
 Interest Total Ser. A 20.Yr. __Income 4¾% Bonds__ 5 Percent Class A.
 Principal Through Claim Undisturbed (Or Collat. Series B Series C Series A Series B 90-Year Limited Capitalization
 Amount 12-31-54 12-31-54 Cash Trust Notes) 35-Year 50-Year 65-Year 75-Year Debentures to $5 Div. Class B
 Missouri Pacific
Equipment obligations................................ $ 51,261,356[*] .......... $ 51,261,356 ........... $51,261,356 $ 51,261,356
First and refunding mortgage 5-percent bonds:
 Series A, due February 1, 1965..................... 17,840,500 $ 5,277,815 23,118,315 $ 5,277,815 $ 8,920,250 $ 8,920,250 17,840,500
 Series F, due March 1, 1977........................ 94,180,000 27,469,167 121,649,167 27,469,167 47,090,000 47,090,000 94,180,000
 Series G, due November 1, 1978..................... 25,000,000 7,708,333 32,708,333 7,708,333 12,500,000 12,500,000 25,000,000
 Series H, due April 1, 1980........................ 25,000,000 7,812,500 32,812,500 7,812,500 12,500,000 12,500,000 25,000,000
 Series I, due February 1, 1981..................... 61,170,000 18,096,125 79,266,125 18,096,125 30,585,000 30,585,000 61,170,000
General mortgage 4-percent bonds, due March 1,
 1975 .............................................. 49,339,421 43,089,761 92,429,182 $ 39,471,536 $ 52,957,646 92,429,182
Secured serial 5¼ percent bonds, due December
 1, 1933-56 ........................................ 10,425,000 12,086,484 22,511,484 6,128,799 14,120,329 2,262,356 22,511,484
Convertible 5½-percent bonds, due May 1, 1949. 45,493,000 55,463,549 100,956,549 9,098,600 9,098,600 $ 82,759,349 100,956,549
Plaza-Olive Bldg. bonds, due Oct. 1, 1937-40[1]
Little Rock & H. S. W. first mortgage 4-percent
 bonds, 1939[2]................................... 1,244,592 622,296 622,296 1,244,592
Boonville, St. L. & Sou. first mortgage 5-percent
 bonds, 1951.......................................... 5,500 5,477 10,977 1,077 4,400 5,500 9,900
Central Branch U. P. first mortgage 4-percent
 bonds, 1948 ......................................... 523,000 210,943 733,943 64,503 334,720 334,720 669,440
Claims of general unsecured creditors[3] .......... ........... ...........
Preferred stock ....................................... 70,190,100 115,462,715[**] 185,652,815 $185,652,815[***] 185,652,815
Common stock .......................................... 81,314,343 81,314,343 $ 4,065,717 4,065,717
 ____________ ______________ _____________ ___________ ___________ ___________ ___________ ___________ ____________ ___________ ___________ ___________ ___________
 Sub totals ....................................... 531,742,220 292,682,869 825,669,681 66,429,520 51,261,356 112,556,666 118,686,565 62,690,465 64,318,602 82,759,349 185,652,815[***] 4,065,717 681,991,535
 New Orleans
Equipment obligations................................ 9,443,626[*] 9,443,626 9,443,626 9,443,626
First mortgage bonds:
 Series A, 5½-percent, due Apr. 1, 1954 ..... 15,770,000 216,837 15,986,837 216,837 $ 15,770,000 15,770,000
 Series B, 5-percent, due Apr. 1, 1954 ............. 14,345,900 179,324 14,525,224 179,324 14,345,900 14,345,900
 Series C, 5-percent, due Aug. 1, 1956 ............. 4,600,000 95,834 4,695,834 95,834 4,600,000 4,600,000
 Series D, 4½-percent, due Aug. 1, 1956...... 5,900,000 110,625 6,010,625 110,625 5,900,000 5,900,000
Claims of general unsecured creditors[4]
Common stock (held by public)........................ 859,800 859,800 505,364 1,164,215 186,282 1,855,861
 ___________ ___________ ___________ ___________ ___________ ___________ ___________ ___________ ___________ ___________
 Sub totals........................................ 50,919,326 602,620 51,521,946 602,620 9,443,626 40,615,900 505,364 1,164,215 186,282 51,915,387
 International-Great Northern
Equipment obligations ............................... 6,883,769[*] 6,883,769 6,883,769 6,883,769
First mortgage bonds:
 Series A, 6-percent, due July 1, 1952.............. 17,250,000 8,797,500 26,047,500 2,070,000 12,075,000 9,901,848 2,000,652 23,977,500
 Series B, 5-percent, due July 1, 1956.............. 6,000,000 2,550,000 8,550,000 600,000 4,080,000 3,219,514 650,486 7,950,000
 Series C, 5-percent, due July 1, 1956.............. 5,500,000 2,337,500 7,837,500 550,000 3,740,000 2,951,214 596,286 7,287,500
Adjustment mortgage 6-percent bonds:
 Series A 1952...................................... 13,807,700 20,297,319 34,105,019 2,761,540 3,037,694 17,259,625 6,103,003 29,161,862
Claims of general unsecured creditors[5]
 ___________ ___________ ____________ ___________ __________ ___________ ____________ ___________ ___________ ___________ ___________ ____________
 Sub totals....................................... 49,441,469 33,982,319 83,423,788 3,220,000 6,883,769 19,895,000 16,072,576 6,008964 3,037,694 17,259,625 6,103,003 75,260,631
 =========== =========== =========== =========== =========== =========== =========== =========== =========== =========== =========== ========== =========== ===========
 Grand totals .................................... 632,103,015 327,267,808 960,615,415 70,252,140 67,588,751 40,615,900 132,451,666 135,264,505 69,863,644 67,542,578 100,018,974 191,755,818[***] 4,065,717 809,167,553
 =========== =========== =========== ============ =========== ============ =========== =========== =========== =========== =========== =========== =========== ===========
 Cumulative grand totals........................... 108,204,651 240,656,317 375,920,822 445,784,466 513,327,044 613,346,018 805,101,836[***] 809,167,553

NOTES
[1] These bonds outstanding in the principal amount of $385,500 as of December 31, 1953, by order No. 4340-A of the District Court, dated June 25, 1954, are to be called by the Missouri Pacific trustee for final payment at July 30, 1954.
[2] Balance of claim of $2,052,000, including interest, taken care of in Chicago, R. I. & P. Ry. Co. Reorganization, 257 I. C. C. 307 (Appendix).
[3] Amount not finally ascertained  will receive for each $1,000 of claim, principal plus interest, as allowed by the court  $90 of series A and $90 of series B general mortgage income 4¾-percent bonds, and $820 of 90-year 5-percent debentures.
[4] Amount not finally ascertained  will receive for each $1,000 of claim, principal plus interest, as allowed by the court, $1,000 of series C first mortgage 4¼-percent bonds.
[5] Will not participate in the reorganization.
[*] As of December 31, 1952.
[**] Cumulated dividends as of December 31, 1954, on preferred stock outstanding in the hands of the public (701,901 shares).
[***] Does not reflect stock distributable to overcharge claims liquidated in the total amount of $303,500, the holders of which, by court's orders Nos. 763A and 1596 (court record, pages 10739 and 13135), are entitled to be paid in new class A stock on a par-for-par basis.